## JOHN KELLEY v. THE STATE.

### *No. 502.   Decided October 29.*

**1. Drunkenness — Voluntary Recent Use of Ardent Spirits— Temporary Insanity.** — Our statute, Penal Code, article 40a, provides, that "Neither intoxication nor temporary insanity of mind produced by the voluntary recent use of ardent spirits, shall constitute any excuse in this State for the commission of crime; nor shall intoxication mitigate either the degree or penalty of crime; but evidence of temporary insanity produced by such use of ardent spirits may be introduced by defendant in any criminal prosecution, in mitigation of the penalty attached to the offense for which he is being tried, and in cases of murder, for the purpose of determining the degree of murder of which the defendant may be found guilty."

**2. Construction of Statute— Delirium Tremens— Mania a Potu.** The statute above quoted regulating drunkenness has nothing to do with the insanity known as delirium tremens or mania a potu. Such insanity, called "settled insanity" to distinguish it from "temporary insanity," has always been held to be an absolute defense to crime. It is the remote consequence of voluntary intoxication from gross and habitual drunkenness.

**3. Same—Construction of Statute.**—Under our statute, temporary insanity produced by the recent use of intoxicating liquors does not destroy responsibility when defendant, sane and responsible, made himself voluntarily intoxicated. Following Clore's case, 26 Texas Court of Appeals, 624, and Evers' case, 29 Texas Court of Appeals, 539. Hurt, P. J., dissents.

**4. Same.**—"Temporary insanity," spoken of in the statute, differs from "settled insanity" in the causes producing it, and its consequences. Practically, they may be the same, but in the first responsibility never ceases, in the other there is none. Hurt, P. J., dissents.

**5. Charge of the Court—Erroneous but in Defendant's Favor.—** On a trial for burglary, where the court charged the jury as follows: "You are charged that intoxication, produced by the recent use of ardent spirits, constitutes no excuse for the commission of a crime. However, in this case, if you find and believe that the mind of defendant, at the time he entered said house, was in such a condition from drunkenness, or from insanity produced by the use of ardent spirits, that he (defendant) could not form a fraudulent and criminal intent, then you will acquit the defendant; but any amount of voluntary drunkenness which does not reach the status above indicated would not form a justification for the commission of the act." *Held,* that the charge does not distinguish between settled and temporary insanity, but practically instructs the jury that if the drunkenness reaches insanity, whether from recent or remote use of intoxicants, they must acquit. But while this is an error, it operates for the benefit of the defendant, and he can not complain. Hurt, P. J., dissents.

**6. Responsibility of Defendant for Consequences of His Own Voluntary Act.—** A man who voluntarily places himself in such condition as to become incapable of distinguishing between right and wrong, is simply responsible for any injury resulting therefrom, as any one would be who does an act likely to produce death, though at the time having no specific intent to take the life of any one.

APPEAL from the District Court of Wise. Tried below before Hon. J. W. Patterson.

On a trial upon an indictment charging him with burglary with intent to commit theft, defendant was found guilty in the court below, and his penalty assessed at two years in the penitentiary.

The testimony, in substance, as it appears in the record, is as follows:

Willie Helm, for the State: Am the son of Roe Helm, who was running a saloon in Rhome, Wise County, Texas, in July, 1892. On the night of July 6 I was stopping at the depot, about thirty yards from the saloon, with young Mr. Whiteside. We heard glass breaking in the rear of the saloon, and going immediately around behind the saloon, found defendant fastened in a wire fence, about six feet in rear of the saloon. We unloosed him, and he fell over on the grass, and seemed unconscious. Saw no one else around there. We then went into the saloon, and found a window light 10x14 broken in the rear of the saloon, and some cigars on the floor. Then went back to where defendant was, and he had moved some five or six feet from where he was, and was then sitting up. When he first fell down, after we had unhitched him from the fence, I noticed him clutching a bottle of beer in his breast as if trying to hide it. When we went to him the second time, I asked him where he got the beer. He said Grant Ellars gave it to him. He got up, and went off to a lumber pile and laid down on it, and we got him to get up and go home. He was all right then, and talked sensible. He boarded at Mr. Barrett's house. Where he had been sitting in the field, we found three or four bottles of beer, two of them with their necks broken. We found blood on the glass at the window, and blood on defendant's hands.

Cross-examined, witness testified: That defendant had been drinking eight or ten days before this. Had been drunk prior to his breaking into the house. Had drank up all the money he had, and father had shut him off two or three days before the house was broken into. He got sober, but would lay around the saloon, and beg for beer. He would ask strangers for it. When we found him hitched in the fence, he was mumbling something and talking incoherently. When we found him sitting up, afterwards, he seemed to be all right. When asked where he got the beer, he said Grant gave it to him. Grant Ellars was my father's bartender. He was in town, and came down to the saloon soon after. The beer defendant had was in pint bottles; same as some in the saloon. Had seen the defendant several times during the last two or three days before the burglary. The day of the burglary he was sober. Did not see him drink any that night. He seemed to know what he was doing that night, after we woke him up. It was about 10 or 11 o'clock at night when we heard the glass break and found the defendant.

C. C. Whiteside, for the State, being sworn, testified substantially the same as the first witness Helm about hearing the glass breaking in the saloon, and about finding the defendant and the beer. He further testified that he had seen the defendant before that day. Did not see him take a drink that day.

Grant Ellars testified, for the State: Was bartender for Roe Helm, July 6. Did not give defendant my consent to enter the saloon. Did not give him the beer he was found with that night. The doors of the saloon were locked, and had not been opened. Saw where the window pane was broken out. A man could enter there. Saw a man larger than defendant go in and out there. Saw the cigars and beer that defendant had that night, and they belonged to Helm's saloon.

Cross-examined: The defendant had been drunk for about two weeks prior to this. I had shut him off two or three days before this; he had run out of money. I would give him a drink of beer once in a while to get rid of him. He was bothering our customers. He would ask them for beer, whether he knew them or not. I had closed down on him. He was not drunk the day before the burglary; he said he was going to work the next morning. When I saw him that day he was all right—not drunk. Gave him a glass of beer that morning. Don't know of his having any more that day. He was around the saloon all day. I know he ate a day or two before, because I gave him a can of oysters.

Roe Helm, for the State, testified: Am owner, and occupied the saloon at the time of the burglary. Did not give my consent for defendant to enter there, or take anything therefrom. Was at the saloon until 5 o'clock that evening. The beer and cigars in the saloon were mine. I gave the defendant three glasses of beer that morning. Did not see him after 5 o'clock. He did not seem drunk before that time. Defendant had been

drinking heavily about a week, until about two or three days before this, when we stopped him. He run out of money. Had been on a continuous drunk until two or three days before this. If a man has been drinking heavily, and can get nothing more to drink, it will produce nervousness, and an unnatural mental condition. Defendant was sensible and rational when I saw him last, the evening of the burglary.

William Barrett, for defendant, testified: I know the defendant. He is a section hand on the railroad at Rhome, Texas. He boarded with me at the time of this housebreaking. He had been on a big drunk for about two weeks. For a day or two before the house was broken he did not know what he was doing. He had not eaten anything at my house for several days. He was very nervous and exhausted just prior to this occurrence. I saw him about dark on the night of the burglary. He did not then know anything. He was not in his right mind. He was at my house. I saw him take several glasses of beer that evening. At night, when I saw him last, he was in a kind of stupor. He had been drunk for about two weeks. I drove him off from my house that night for using bad language. I had seen him lying helpless around Rhome. I saw him lying up by the elevator, and over in a box car, and other places. I know his general reputation for honesty in the neighborhood in which he lives. It is good.

J. D. Carson, for defendant, testified: Know defendant; saw him prior to the burglary. He had been on a big drunk for about two weeks. Saw him in the saloon, and also saw him lying around drunk and in a helpless condition. He did not eat anything for some days before this. Saw him the day of the burglary. He was shaking and seemed to be exhausted; was very nervous and weak. Know defendant's general reputation for honesty in the neighborhood where he lived. It was good. The day before the burglary defendant was crazy for something to drink. Was craving and begging for it.

Defendant, for himself, testified: Was section hand at Rhome prior to my arrest for this offense. Remember when I was arrested at Mr. Barrett's house. It was 2 o'clock in the morning. Had been drinking heavily since June 28. Had $17 when I began, and then had my time and traded it to Mr. Ellars, the bartender, at 5 per cent discount. This was all gone. Don't remember anything about the saloon being broken into. Took some alcohol the evening before about 2 o'clock. It was given me in the saloon by a section man named McLaughlin. Afterward took some beer. Not sure about this, and don't know who I got it from. Don't remember to have seen Willie Helm and Whiteside, and don't remember of their talking to me. Had weak, trembling spells, and could not eat during my drunk. Would get cold and then hot, and did not know all the time what was going on. Lost $9 from my pocket at one time, and $4.85 at another; but did not know anything about it. I missed it. Grant

Ellars said I lost it.   I don't remember anything that occurred from 4 o'clock that evening until I was arrested by the constable.   If I broke into the saloon, I did not know it.   Grant Ellars had given me prior to this several glasses of beer.   I remember when I heard glass fall; went to the fence where the boys found me hanging on the wire.

Cross-examined:   Was arrested by Mr. Reynolds.   He says it was about 2 o'clock.   Told him I was unable to walk to the town of Aurora. He said that if I didn't walk he would tie a rope around my neck and tie me to a horse and drag me.   He made me walk.   Don't know how I came in the wire fence.   Imagine I was asleep in Mrs. Morris' field, and heard the noise of glass breaking and started to it, and got hung, but don't remember anything about it.   Remember my trial at Aurora, but don't remember what I said.   The court warned me.   Think I told it like I do now.   Had slept before at Mrs. Morris' haystack during the day and at night while on this spree.   Remember about taking alcohol and beer that evening, and remember about the constable waking me up when he arrested me.   Mr. Helm and all of them were talking about it, and I suppose they arrested me for breaking in the saloon.   Think I was tried the day after I was arrested, and was then brought to Decatur and put in jail.   While on this spree, and a day or two before the house breaking, I had had chilly sensations, and would then break out in a sweat.

Mr. Taylor, for defendant, testified:   Was jailor when defendant was placed in jail.   For two or three days thereafter he was shaky and nervous.   Did not eat anything, and acted like a man suffering from a prolonged drunk, but he was rational.

Defendant's counsel asked a special instruction, as follows:   "You are further instructed, if you believe from the evidence that defendant was wholly deprived of the use of his reason at the time of the offense charged, by his being drunk, you will acquit the defendant, unless you further believe from the evidence that defendant got drunk with the intent to commit the offense."

A bill of exceptions was taken to the fifth paragraph of the court's charge, as given to the jury, which paragraph will be found copied in full in the fifth subdivision of the syllabus, supra.   The objections urged to this particular charge will be found stated and discussed in the opinion of the court.

*T. J. Wyatt* and *T. A. Fuller*, for appellant.—The charge of the court upon temporary insanity of mind as a defense should have been in the language of the statute, and the court should have instructed the jury, in the fifth paragraph of the charge, that if the defendant, at the time of the commission of the act, was laboring under such defect of reason as not to know the nature or quality of the act he was doing, or that if he did not know that he was doing wrong, he should be acquitted.   Webb

v. The State, 5 Texas Ct. App., 596; Williams v. The State, 7 Texas Ct. App., 163; Powell v. The State, 37 Texas, 348.

By reference to the statement of facts in this case, the testimony both for the State and the defendant shows with preponderating force that at the time defendant was charged with the crime for which he was tried, that he was laboring under such a defect of reason from "mania a potu" or delirium as not to know the nature and quality of the act he was doing.

If he did not know what he was doing, then he did not know he was doing wrong; and being utterly deprived of his reason and understanding, he could not commit crime. We think this doctrine is within the rule of current decisions in this State.

The inquiry should have been made as to defendant's knowledge of right and wrong, with respect to the very act with which he was charged. Willson's Crim. Stats., sec. 81; Carter v. The State, 12 Texas, 500; Webb v. The State, 5 Texas Ct. App., 596; Williams v. The State, 7 Texas Ct. App., 163; Clark v. The State, 8 Texas Ct. App., 350; King v. The State, 9 Texas Ct. App., 515; Warren v. The State, 9 Texas Ct. App., 620; Johnson v. The State, 10 Texas Ct. App., 571; Pettigrew v. The State, 12 Texas Ct. App., 225; King v. The State, 13 Texas Ct. App., 277; Thomas v. The State, 40 Texas, 60; Erwin v. The State, 10 Texas Ct. App., 700; Burkhard v. The State, 18 Texas Ct. App., 599; Powell v. The State, 37 Texas, 348.

Previous to the statute regulating intoxication as a defense in this State, the court passed upon it according to the rule of the common law, and has been held by the courts and ruled in the cases cited. We think, notwithstanding our statute regulating intoxication as a defense. we are not wholly cut off from the old and established rule, where a positive case of "mania a potu" or delirium exists. We think the court should have instructed the jury on the law applicable to the facts in the case. The defendant has reasons to justly complain of the charge of the court, especially the latter part of paragraph 5, which had an emphasizing effect upon the jury. The language used by the court is as follows: "But any amount of voluntary drunkenness which does not reach the status above indicated would not form a justification for the commission of the act."

The finding of the jury is most clearly and distinctly against the evidence. The language used produced an effect upon the jury that they were compelled to find defendant guilty. At all events, the court should have stopped after charging the statutory rule upon intoxication, and left the jury free to decide the issue from all the circumstances in evidence in the case.

The fifth paragraph of the court's charge reads as follows: "You are charged that intoxication produced by the voluntary recent use of ardent spirits constitutes no excuse for the commission of a crime; however, if in this case you find and believe that the mind of the defendant at the time he entered said house (if you find he did enter the same) was in

such a condition from drunkenness, or from insanity produced by the use of ardent spirits, that he, the defendant, could not form a fraudulent and criminal intent, then you will acquit the defendant; but any amount of voluntary drunkenness which does not reach the status above indicated would not form a justification for the commission of the act, if it was committed."

With forceful and unnecessary repetition, the court here reiterates in a paragraph twice over the dizzy height to which defendant must ascend with his evidence before his defense is entitled to consideration at the hands of the jury.

The parting language of the court is, that in this contest for his liberty upon this issue, the presumption of law is, that he knew and intended the nature and consequences of his act, or the act being proved characterized the intent.

Concede that the opening clause of this paragraph is the law, and that what immediately follows is all that defendant could ask, as presenting his defense, how futile was this crumb to him, after it was qualified, neutralized, and destroyed in effect by the pointed proviso attached to it, recalling the minds of the jury to the extraordinary status required by law to be attained by defendant before his defense should receive consideration at their hands.    This is followed by telling the jury that the presumptions were against him upon the issue.    As thus stated, he was deprived of a fair and affirmative charge upon the defense made by the evidence, and it was fundamental error not to give such.

We contend, however, that said paragraph is not the law of burglary and of this case.    In the case of Carter v. The State, 30 Texas Court of Appeals, 551, Judge Davidson restates as fundamental criminal law, that it is the intent which characterizes the act, and not the act the intent.    Burglary must be characterized by a certain intent, and this charge relieves the State of showing such intent, and puts against the defendant the presumption of such intent, and requires him to show its nonexistence.    Collins v. The State, 20 Texas Ct. App., 197; Allen v. The State, 18 Texas Ct. App., 120; Reed v. The State, 11 Texas Ct. App., 510; Peter v. The State, 23 Texas Ct. App., 684; Carter v. The State, 30 Texas Ct. App., 551.

Again, we insist, that under the undisputed evidence the defendant should not have been convicted; and also that the trial court should have granted him a new trial, for the reason that the verdict of the jury was against the evidence.    A section hand who, though lowly in the sphere of life, had prior to this occurrence borne good character for honesty and integrity, had been on a two weeks drunken debauch.    He had delirium for days, and at 6 o'clock on the night of the alleged burglary, he was crazy, and did not know what he was doing.    At 10 o'clock on same night, with his bare hand, he broke out a window of a beer

saloon, near which was situated a barrel containing beer in bottles, and in thirty feet of where the State's witnesses were sitting, and immediately thereafter he was found with some beer bottles convulsively clasped to his bosom, and in an unconscious state, and upon being asked if he was hurt, his only reply was to hold up his cut and bleeding hand. The saloon man testifies, that at 3 o'clock that evening he was not insane. He merely judges from his outward appearance. The defendant testifies that he was wholly unconscious of having done the act, and we most candidly insist that this is a conviction that should not be permitted to stand. We invite the inspection of the entire record, wherein we think the soundness of our contention will be manifest, and we respectfully ask that this cause be reversed and remanded, for the errors above urged.

On motion for rehearing (which was overruled) the same learned counsel filed the following brief and argument:

Now the appellant comes and moves the court for a rehearing, and asks that this cause be reversed and remanded for the following reasons, to-wit:

1. Because the defendant was entitled to a charge under the evidence upon "settled insanity," unmixed with the doctrine of drunkenness, and the charge given being excepted to, was error.

2. Because the evidence fairly raised the issue of settled insanity, and it was part of the law of the case, and the jury should have been charged that if at the time of the commission of the act the defendant was laboring under such defect of reason as not to know the nature and quality of the act he was doing, or if he did not know he was not doing wrong, he should then be acquitted.

Barrett testified: Defendant had been on a drunk for about two weeks. For a day or two before the house was broken into he did not know what he was doing. He was nervous and exhausted. I saw him about dark just prior to this burglary. He was not in his right mind; saw him lying helpless around Rhome for two weeks.

Carson says: Saw defendant for two weeks before the burglary; saw him lying around drunk and helpless; saw him the day of the occurrence; he was shaking, exhausted, and weak. The day before the burglary saw him, and he was crazy for something to drink.

Defendant testified that he was unconscious and irrational, and did not know what transpired. Smith v. The State, 19 Texas Ct. App., 95; Erwin v. The State, 10 Texas Ct. App., 700.

3. A rehearing should be granted and the cause reversed, because of this language used by the court in the charge, which was duly excepted to, to-wit: "Every man is presumed, until the contrary is shown to the jury, to have a sufficient degree of reason and understanding to be responsible for his acts." This was tacked on to the fifth paragraph, and by mistake was omitted in our quotation in former brief. It was a part of fifth paragraph.

We call attention to appellant's bill of exception found in the transcript. The State's witness testified, for the State, that upon hearing glass fall he went around behind the store and found defendant hitched in a wire fence a few feet from the back of the saloon, and when he was unhitched he fell over in an unconscious state; and upon cross-examination said further, that he was mumbling and talking incoherently when he first found him hung in the fence. The court, in effect, charged that the presumption was, that these witnesses were wrong. We take the position that the evidence under the peculiar phase did not authorize the court to charge that the defendant was presumed to have a sufficient degree of reason and understanding to be responsible for his act. Again we most earnestly submit that this charge, taken as a whole, was most dangerously misleading.

Responsibility for his acts means, in the connection used in the charge, criminal liability and consequent punishment. The jury could not have understood it otherwise. Indeed, it is the plain meaning. The act having been proved, the responsibility ensues—that is to say, the statutory penalty follows. The ingredients necessary to make a complete case is presumed until the contrary is shown, is the doctrine of the charge. The jury are told that appellant is presumed to be responsible for his acts; presumed to merit punishment; presumed to have done it with fraudulent intent; presumed to owe responsibility to the law; and to have filled its measure under the law of burglary by proof of the naked act, unless the contrary is shown. If it is the law that when an act is committed in a state of mind when the perpetrator does not know right from wrong, his criminal liability depends upon what made him so, or the length of time he had been in this condition, still we insist that this charge is obnoxious to the bill of exception retained to it. It means more than to say that the burden of proof is upon the defendant to show his insanity. It reaches the main case, and strengthens, by the great weight of presumption, the chief elements of guilt. If it is the intent which characterizes the act, and not the act the intent, why should the jury be told in a burglary case that responsibility is presumed when the act is shown? It takes something more than the act alone; it takes intent also.

We respectfully ask an examination of our bill of exception to the court's charge, from which it appears that the appellant not only suffered injury from the substance of the matter charged and from the omission to charge the law, but from the manner of its statement; being complex, reiterative, and injurious repetitions, it was rendered doubly erroneous and hurtful. We respectfully ask that a rehearing be granted, and the cause reversed and remanded for the errors assigned by us in our original brief, and by the reasons assigned in this motion. Carter v. The State, 30 Texas Ct. App., 551; Collins v. The State, 20 Texas Ct. App., 197; Lyle v. The State, ante, 103.

*R. L. Henry*, Assistant Attorney-General, for the State; but no brief for the State has come into the hands of the Reporter.

SIMKINS, JUDGE.—Defendant was convicted of burglarizing a saloon at night, and taking from thence some bottles of beer. The defense was delirium tremens and drunkenness.

The court charged on this defense as follows: "You are charged that intoxication produced by the voluntary recent use of ardent spirits constitutes no excuse for the commission of a crime. However, in this case, if you find and believe that the mind of the defendant, at the time he entered said house, was in such a condition from drunkenness, or from insanity produced by the use of ardent spirits, that he (the defendant) could not form a fraudulent and criminal intent, then you will acquit the defendant; but any amount of voluntary drunkenness, which does not reach the status above indicated, would not form a justification for the commission of the act." The defendant objects to the last part, as emphasizing and impressing, with needless repetition, upon the jury to what extent the drunkenness must extend, before the jury can consider it in justification, and as being incorrect. The counsel is correct in saying that the statute regulating drunkenness has nothing to do with the insanity known as "delirium tremens" or "mania a potu." Such insanity, called by Mr. Wharton "settled insanity," to distinguish it from "temporary insanity," has always been held to be an absolute defense to crime. No man intends or desires to be under the influence of delirium tremens. It is rather shunned than coveted, and is always an involuntary result, and generally caused by an abstinence from liquor, and no man voluntarily assumes it for the purpose of covering guilt. 1 Whart. Crim. Law, sec. 48.

In United States v. Drew, 5 Mason, 28, where Drew, the captain of a ship, after weeks of intoxication, suddenly ceased to drink, and became affected with delirium tremens, and while in this condition killed his mate, Story, J., declared that criminal responsibility would not attach where the delirium is the remote consequence of voluntary intoxication caused by the antecedent exhaustion of the party arising from gross and habitual drunkenness. "Had Drew committed the crime while he was in a fit of intoxication, he would be liable to conviction for murder. As he was not intoxicated, but insane from an abstinence from liquor, he is not guilty. The law looks to the immediate, and not the remote, cause."

In United States v. Clarke, 2 Cranch, Circuit Court, 158, the court told the jury, that if they should be satisfied that the prisoner, at the time of committing the act charged in the indictment, was in such a state of insanity, not produced by the immediate effects of intoxicating drinks, as not to be conscious of the moral turpitude of the act, they should find him not guilty. But it is laid down by the statute of this State that tem-

porary insanity produced by the recent use of intoxicating liquors does not destroy responsibility, when defendant, sane and responsible, made himself voluntary intoxicated. Penal Code, art. 40a; Clore's case, 26 Texas Ct. App., 624; Evers' Case, 29 Texas Ct. App., 539.

Mr. Wharton well says there can be no doubt on this point, either on principle, policy, or authority. Whart. Crim. Law, sec. 49. A man who voluntarily places himself in such a position as to become incapable of distinguishing between right and wrong, is simply responsible for any injury resulting therefrom, as any one would be who does an act likely to produce death, though at the time having no specific intent to take the life of any one.

Temporary insanity, spoken of in the statute, therefore differs from settled insanity in the causes producing it and its consequences. Practically, they may be the same; that is, both may come under the definition of not being able to distinguish right from wrong, and being unconscious of the nature of the act done, yet the consequences are different. In the first, responsibility never ceases; in the other, there is none.

Now, the statute regulates the consequences of temporary insanity by allowing it, in all cases of crime, to be proven in mitigation of the punishment; but it is not allowed to excuse the crime, and in murder it is also admissible to reduce the degree. The charge of the court is therefore right, that any intoxication short of insanity is not to be regarded by the jury for any purpose; but if the drunkenness reaches insanity, that is, if the defendant becomes, under the influence of drink, incapable of distinguishing between right and wrong as to the particular act done, then the jury may regard it in giving a lower punishment, but not in acquittal of the person. This question is eliminated in this case, because, if guilty, the defendant could not have received a lower punishment than was inflicted. Testing the charge by the foregoing views, we find that it does not distinguish between settled and temporary insanity, but practically instructs the jury, that if the drunkenness reaches insanity, whether from the recent or remote use of intoxicants, they must acquit. While this is an error, it operates for the benefit of the defendant, and he can not complain.

Upon the facts of the case, we are not disposed to remand it. Defendant had been drinking during the day, and at night broke into the saloon, and carried bottles of beer into the field and drank it, and was on another trip, when he got hitched in the fence, and was discovered. We think there is sufficient testimony to sustain the verdict, and the judgment is affirmed.

*Affirmed.*

Davidson, J., concurs. Presiding Judge Hurt does not agree to the doctrine announced in the opinion, and refers to the Lyle case, ante, 103.