## WILL SCRUGGS v. THE STATE.

### No. 982.    Decided March 25th, 1896.

1. **Testimony of Witness, Beyond the State, Taken at the Examining Trial—Predicate for.**

On a trial for murder, where the testimony of a witness taken at an examining trial was objected to because a sufficient predicate had not been laid by proof that the witness was beyond the State. Held: That proof that a witness only knew that the absent witness was in another State, from letters received from the guardian of said witness, by a third party, was purely hearsay and insufficient to establish the predicate.

2. **Same—Verbal Acts.**

In laying a predicate for the introduction of the testimony of a witness who has gone beyond the State since said testimony was given, the only necessary fact to be established is that he was not in the State of Texas, and such fact is sufficiently proved by testimony showing that the absent witness was seen leaving Texas on a train, to go to his home in Arkansas, and said at the time that he was going to Arkansas. What one says when he goes upon a journey or returns to his home, is admissible in evidence as a verbal act indicating a present purpose and intention, and is sufficient, at least to establish a prima facie case.

3. **Murder—Charge—Implied Malice—Adequate Cause.**

On a trial for murder, where the court, in defining implied malice, instructed the jury that, "if they believed that defendant shot and killed deceased with malice aforethought, in a sudden transport of passion aroused without adequate cause, they should find him guilty of murder in the second degree." Held: It was not error in this connection to omit to define "adequate cause," and especially so where that term was sufficiently defined in the portion of the charge on manslaughter.

4. **Same—Aggravated Assault—"Apparent," and "Evident."**

On a trial for murder, where the charge of the court, on the issue of aggravated assault and accidental killing, instructed the jury, "And, if you do not find from the evidence an apparent intention on the part of the defendant to kill, you will find him guilty of an aggravated assault," etc., and it was objected that the word "apparent" was used instead of the statutory word "evident," intention. Held: The word "apparent," was more liberal in favor of defendant than the word "evident," and there was no ground of complaint.

5. **New Trial—Newly Discovered Evidence.**

A new trial will not be granted for newly discovered evidence to impeach a witness.

**6. Murder in the Second Degree—Evidence Sufficient.**

See, evidence summarized in the opinion, which is held sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Lamar.    Tried below before Hon. BEN H. DENTON, Special Judge.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at seven years' imprisonment in the penitentiary.

The indictment charged that defendant murdered one George Rutherford, in Lamar County, on the 26th of November, 1894, by shooting him with a pistol.    All the important features of the case are stated in the opinion, and the points raised and discussed on the appeal are also so fully illustrated in the opinion as to render any further statement in connection therewith altogether unnecessary.

*Park & Bermingham,* for appellant, filed an able and interesting brief in the case, devoted chiefly to supposed errors in the charge of the court; and the action of the court in overruling the motion for new trial, based upon newly discovered evidence, and upon the insufficiency of the evidence.

*Mann Trice,* Assistant Attorney-General, for the State.

[No brief found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the the second degree, and his punishment assessed at a term of seven years in the penitentiary, and from the judgment and sentence of the lower court he prosecutes this appeal.    There is but one bill of exceptions in the record, and that is to the admission of the evidence of James Jackson, taken on the examining trial of this case.    The ground of objection stated in the bill is that no sufficient predicate was laid.    It was agreed that the absent witness, James Jackson, had testified in the case on the examining trial, and that his testimony was in the record of that trial; but the contention of the appellant was, that it was not shown, by legal and competent testimony, that said James Jackson was at Sedalia, in the State of Missouri.    R. W. Baughn, the witness by whom it was proposed to lay the predicate, testified, in substance, that he was acquainted with James Jackson; that said Jackson was in Sedalia, Mo.; that he knew this from letters that he saw passing from him and others. On being examined more particularly, he stated that the letters he had seen were from the guardian of James Jackson, who lived at Monticello, Ark., and were addressed to the son-in-law of witness, who lived near Petty.    The appellant claims that this predicate was not sufficient to show that said witness, Jackson, was then in Missouri; that none of the letters were from Jackson, but were from a third party in another State; and that said testimony was purely hearsay.    In this contention of the appellant we concur.    But said witness, Baughn, also testified that James Jackson lived in Monticello, Ark.; that at the time of the killing of

George Rutherford, he was in Petty, on a visit to the son-in-law of witness; that, some time after George Rutherford was killed, said Jackson left Petty, to go to his home in Arkansas; that he saw him leave Petty on the train; that he said, at the time, that he was going to Arkansas. This proof was admissible to show he lived in Arkansas; and when he left Petty, Texas, the fact that he stated, at the time he took the train, that he was going to Arkansas, was competent evidence to establish the fact that he was en route to Arkansas. What one says when he goes upon a journey or returns to his home, is admissible in evidence as a verbal act, indicating a present purpose and intention; and in this case, the proof at least raised a prima facie case that the witness, Jackson, was in the State of Arkansas; and whether he went from there to the State of Missouri is immaterial. The only necessary fact to be established is, that he was not in the State of Texas. See, 1 Greenl. Ev., § 108; Richmond v. Thomaston, 38 Me., 232; Cornville v. Brighton, 39 Me., 333. The predicate in this regard was sufficiently laid to authorize the introduction of the testimony of said witness, taken before the magistrate on the examining trial. Appellant assigns as error that part of the charge of the court contained in the seventeenth paragraph thereof. The ground of objection is that the court, in defining implied malice, instructed the jury "that, if they believed that defendant shot and killed deceased with malice aforethought, in a sudden transport of passion, aroused without adequate cause, that they would find him guilty of murder in the second degree." The contention of the appellant is, that the charge is erroneous, because it failed, in that connection, to define to the jury "adequate cause." If the definition of "adequate cause" was necessary, this was given in the court's charge on manslaughter, and was sufficient. This same question was decided by this court at the present term, in the case of Childs v. State, ante p. 573, to which reference is made.

Appellant assigns as error that part of the charge of the court contained in the twenty-third paragraph thereof, which instructed the jury on the law of aggravated assault. Said instruction complained of is as follows, to-wit: "If the jury believe  *  *  *  that, if the defendant unlawfully committed an assault upon George Rutherford, by striking him with a pistol, and such a pistol, as so used for striking, was not in its nature calculated to produce death, and that, in commiting such assault, the defendant accidentally discharged said pistol, and thereby killed said Rutherford, and if you do not find that such discharge and killing were caused by negligence or carelessness of the defendant, and if you do not find from the evidence, an apparent intention on the part of the defendant to kill, you will find him guilty of an aggravated assault, and assess his punishment," etc. The objection of the appellant is that, in the latter portion of the said charge, the court used the word "apparent," instead of "evident," as is contained in the statute. The contention of the appellant is that "evident" has a different meaning from the word "apparent." It is to be presumed that the appellant,

under the circumstances of this case, desired as liberal a charge on the question of aggravated assault as possible, and the word "apparent" in the connection in which it was used, appears to us to be more liberal in favor of the appellant than the word "evident." While the court gave a charge on both negligent homicide and on aggravated assault, based on an accidental discharge of the pistol as used by the appellant in striking (which charge was doubtless based on the testimony of the appellant himself), said charges were scarcely called for, even by his testimony; and certainly, when given, we can see no occasion for him to complain. The testimony on this point was as follows: The doctor who examined the body stated that the wound which caused the death of the deceased entered near the middle of the neck, and very nearly on a line from the center of the chin to the breast bone. The wound was a little to the left of the center. The direction was downward, and a little bit outward, as indicated by the probe. The deceased was paralyzed from the shoulders down, showing that the ball had touched the spinal cord at some point. He also testified that he found another injury on the top of the head of the deceased, about on a line drawn from one ear to the other, and to the left of the center. It was a small V-shaped wound, the open part pointing towards the ear. It had been made by a blunt instrument. This was a slight wound. Appellant, on this point, testified that he drew his pistol, and hit the deceased on the head an overhand lick. "Just as I struck him, the pistol went off. It seemed like at the same time." That he did not intend to fire the pistol. It went off in the lick. When it fired he thought it missed the deceased's head. and did not think he had shot him. That he did not know how it hit him in the neck. The deceased himself stated, as a part of the res gestæ of the difficulty, that the defendant shot him for nothing, and that he also hit him on the head with a pair of brass knucks. The doctor's testimony also indicates that the neck of the deceased about the wound was powder burned. The shooting was done with a double-action, five-shooter, 38-caliber pistol. The theory of the appellant, to reduce the homicide to a negligent homicide or an aggravated assault, was based on the testimony as above given If the wound in question could not have been inflicted in that way—that is, if it was a physical impossibility for the appellant to have struck the deceased on the top of the head, a little to the left of the center, and on a line between the ears, and by the said lick to have discharged the pistol, and for the ball to have penetrated a little to the left of the center of the front part of the neck, between the chin and the breast bone—then there was no accidental homicide in this case. To say the least of it, the contingency is very remote that the shot in question was inflicted after that manner. Still the court, as before stated, gave a charge on negligent homicide, and then a charge on aggravated assault. While it would have been better, in the latter charge, to have followed the language of the statute, and used the word "evident," yet we fail to see how the use of the word "apparent" in that connection, could have injured the appellant. If the jury,

under the charge, believed that the killing was accidental, and they believed that there was no "apparent" intention to kill the deceased, they would scarcely have hesitated in the matter, if they had believed that there was no "evident" intention to kill. They were only required to find the want of "apparent" intention, which, as stated before, was more liberal in favor of the appellant than is contended for by him.

Appellant assigns as error the refusal of the court to grant him a new trial, on account of certain newly discovered evidence, which he sets forth in affidavits, and to which is appended the affidavits of appellant's counsel excusing their want of diligence. One of these witnesses is Miss Jennie Glasscock, and by her affidavit it is shown that she was present at Margraves', and heard the statement by Vesta Mann, testified to by Miss Effie Smith; and the effect of her testimony is to traverse the evidence of the said Effie Smith. On the trial of the case the appellant introduced the witness, Vesta Mann, who testified: That he was at the Smith house, where the homicide occurred, on the night thereof. That he was in his room, upstairs, when the music of the serenaders began. He got up from the table, where he was writing, and went to the window, saw the crowd, saw two persons go off to one side of the yard, and presently he heard one, whose voice he testified was that of the deceased, call the other "a God damned liar," and then a shot was fired. The State, in rebuttal of this evidence, proved by Effie Smith that, after the occurrence at Margraves' house, she heard Vesta Mann state that, when the shot was fired he was upstairs, in his room, at the table, writing. By the newly discovered witness, Jennie Glasscock, it is proposed to prove that she was present at the conversation at Margraves' house by Vesta Mann, and she heard him state that, before the shot was fired, he got up, and went to the window, and looked out on the crowd, and saw Will Scruggs and George Rutherford (the deceased) walk off together, heard some talking, but did not say what he heard. The purpose and object of this testimony was to impeach Miss Effie Smith, and it is a well-established rule that a new trial will not be granted on this account. See, Willson's Crim. Proc., § 2544 (6), and authorities there cited. Besides, Miss Effie Smith stated, in her examination, where she heard the conversation of Vesta Mann, and that she was in the presence of others. Reasonable diligence would have required of the appellant to have questioned said witness as to what others were present, and by this means disclose the presence of Miss Jennie Glasscock, who, for aught that appears, could have been had at the trial.

Appellant also produced the affidavit of one J. G. Smith, whose testimony is alleged to be newly discovered. The testimony of this witness is to the effect that he was present, as one of the attending physicians, on the night the deceased was shot; that he made an examination of him, and carefully examined him about his head and chest and upper part of his body; that he had a good opportunity to discover, from this close examination, any pistol, if any such pistol had been in the breast pocket either of the coat or vest of the deceased; and that he made no

such discovery of a pistol. The purpose of this testimony was to impeach the State's witness, Margraves, who testified that he was at the house of his father when George Rutherford was brought there after the shooting. The coat and vest of the deceased was taken off of him, and handed to him, and he carried them upstairs, and hung them up. About fifteen minutes after that, the doctor called for his coat and vest, witness went to get them, and discovered that he had a pistol on the inside pocket of his vest on the right side. This is the only witness, of all the witnesses, both for the State and the appellant, who testified to finding any pistol at all on the deceased, or in his clothes; and it is a little singular, that the appellant should desire to impeach him. However, it is apparent that, having found the pistol on the clothing of the deceased, it was the purpose to show that, possibly, the pistol was not in the right hand vest pocket at the time of the homicide, but that the deceased had it in his right coat pocket, where, appellant says, he threw his hand just before he shot him. Under the circumstances of the shooting, the appellant would have had the right to shoot on the appearance of danger, and it seems to be immaterial whether or not the deceased had any pistol. But, concede that it would be material, as remotely tending to show that the pistol in question was, at the time of the homicide, not in the upper part of the clothing of the deceased, where the witness Dick Margraves says he found it, but was in his lower clothing, or coat pocket, and thus tending to show that deceased was more likely to have thrown his hand to his coat pocket, where appellant says he did; yet this testimony, as newly discovered evidence, is subject to the same objection as we have above discussed, in that it is impeaching testimony. Moreover, this witness, Dr. Smith, was present at the trial, and it is not shown by any affidavit that any effort was made to find out from him as to the facts about which he now proposes to testify. There is also appended to the motion for a new trial the affidavit of one A. P. Smith, which proposes to correct some of his testimony, given on the trial, to the effect that he had but the one conversation with the appellant about the serenade, and that was at Glasscock's store, after the deceased and others had left, going off on the serenade. This, as we take it, is about the effect of his testimony given on the trial. At least, it is not a material matter. Appellant also appends to his said motion for a new trial, the affidavit of H. E. Warrington. Said witness' affidavit shows that he had a conversation with deceased on the morning of the day of the homicide, and that he told said witness that he was going to the house where Scruggs lived, serenading, that night, and that he guessed Scruggs would be a "Damned sight madder, and that he didn't care a damn, as he generally went fixed to take care of himself." He also states that he had a conversation with said deceased on the night of the homicide, a short time before he started off on the serenade; that he advised the deceased not to go to Joe Smith's, as that was where Scruggs lived, and he and Scruggs were not on good terms. Deceased replied, that "He didn't care a God damn, that he was ready;" and he pulled his pistol from his right-hand coat

pocket, and showed it to him.   The object of this testimony is, doubt-less, to show that the deceased was armed on the night of the homicide. We do not understand this to be a controverted fact.   The State's wit-ness, Margraves, establishes this fact; that is, that he found a pistol in his inside right vest pocket, and that this is nowhere controverted in the record.   The further testimony, that he expressed animosity towards the appellant, is merely cumulative.   We furthermore apprehend, from the shape this witness presents himself, that, no matter what he testified to, it would scarcely find much credence with the jury.   A witness who conceals material facts, when he was solicited by appellant to give him the benefit of them, under the flimsy pretext as stated by him, is hardly to be trusted.   Moreover, the State has produced a number of affidavits to the effect that this witness' reputation for truth and veracity was bad. This is met by affidavits of the witnesses for the appellant to the con-trary effect, but still the affidavits put the witness in a very bad light. We apprehend that, if the appellant had had the benefit of his testimony, it would not have changed the result of this case.   There is also ap-pended to the motion the affidavit of one George Brown, to the effect that he was one of the musicians playing for the serenaders on the night of the homicide; that, when the shot was fired, he and a number of others ran away; that Luther Dowlin was in the crowd, and ran out of the yard just behind the affiant; that, when Dowlin reached a bridge west of the front gate, he saw him stop and stoop down, and put something under the bridge; that it looked like a pistol.   On the trial of the case, the State introduced the witness Luther Dowlin, who denied that he had any pistol on the night in question, or that he put a pistol under the said bridge.   The appellant proved, by George Scruggs, that, about a week after the homicide, he was helping catch some hogs.   One of the hogs was about to run under the bridge to the west of the yard, and, in chasing it, he found a pistol under said bridge.   The object of this testimony on the part of the appellant was probably to show that not only the deceased, but that his friend, Luther Dowlin, both went armed on the night of the serenade, expecting to have a difficulty with the appellant.   But the circumstances of this killing do not indicate any conspiracy between the deceased and the said Dowlin, nor do they indi-cate that said Dowlin in any manner participated in the difficulty; and the fact that he was armed on the occasion in question does not appear to be material.   Besides, the newly discovered testimony was to impeach the witness Dowlin; and a new trial, as we have stated above, will not be granted for that purpose.

The record in this case shows that some antagonism had been en-gendered between the appellant and the deceased a short time before the killing.   About a week before the occurrence, appellant got up a party, and failed to invite the deceased until about an hour before the party was to occur.   Deceased stated that he could not go; that it was too late; that he thought that, as the party was going to occur at his uncle's, he ought to have had an invitation.   Appellant said he could

not go around and invite everybody, and, according to two witnesses, he stated he "didn't give a God damn," and repeated this expression. A few nights thereafter, the deceased got up a party, and did not invite the appellant; and, on the night in question, deceased got up the serenade, and went to Joe Smith's (the step-father of the appellant, and where he lived), and were there serenading, when the difficulty occurred. The appellant, when he heard the music, was at the store of one Glasscock, in the little town of Petty, and was armed at the time, and said he "would go over there and tell them to leave." Little Frank Embry proposed to go and ask them to leave, and appellant told him, "No; that he would go himself." He went in the yard, spoke to the deceased, called him aside, and after some altercation, in which the appellant and another witness testify that the deceased called him a "damned liar," a shot was fired and the deceased fell mortally wounded. The witnesses who were in the yard serenading with the deceased heard no oath from him, nor did they see any demonstration. They heard some talking out there, and heard the shot fired. The deceased, after he fell, said that appellant had killed him for nothing, and that he also struck him with brass knucks. Appellant's theory is presented mainly by his testimony, in which he shows that he went to the yard, spoke to the deceased, invited him to one side, and there asked him to leave. He stated that he had as much right there as any one else. Appellant stated that "this is my home, and you have not acted right with me, and I do not want you here." He stated that, when he told him, "you haven't treated me right," deceased said, "you are a God damned liar," and threw his hand to his right side at the same time. That he then drew his pistol, and hit him on the head an overhand lick, and, just as he struck him the pistol fired, and the deceased fell. All of the theories presented by the evidence in the case, including murder in the first and second degrees, manslaughter, negligent homicide, aggravated and simple assault, and self-defense, were submitted to the jury. No doubt, the jury did not credit the appellant's version of the homicide. The physical facts, which strongly antagonized his version of the affair, unquestionably must have strongly influenced them in their verdict. We believe the evidence justified them in their finding of murder in the second degree, and the judgment and sentence of the lower court is affirmed.

*Affirmed..*