### CARMEL LUJANO v. THE STATE.

#### No. 740.　Decided November 8.

1. **Rape—Charge—Requested Instruction as to Corroboration of Prosecutrix.**—On a trial for rape, defendant requested a special instruction to the jury, to the effect, "You can find the defendant guilty on the unsupported testimony of the prosecuting witness, but when corroborative testimony can be procured, its nonproduction should tell seriously against the prosecution." *Held*, that the instruction was properly refused, and especially so in view of the fact that evidence of corroboration is strong and cogent upon every material issue.

2. **Charge — Practice. —** A court is not required to charge the jury upon matter not made an issue in the case.

3. **Same — Penetration — Carnal Knowledge. —** On a trial for rape, where the court has instructed the jury, that in order to convict they must believe the defendant "did, by assault, ravish and carnally know the prosecutrix," an exception that said charge is defective and insufficient, because it failed and omitted further to instruct the jury, in the language of article 532, Penal Code, that "penetration only is necessary to be proved on a trial for rape:" *Held*, not maintainable. The charge of "carnal knowledge of a female" is sufficiently definite and distinct to enable the jury to understand the nature of the offense, without specifying the particular manner in which that carnal knowledge was had. Following Burk v. The State, 8 Texas Criminal Appeals, 336; and McMath's case, 55 Georgia, 303.

4. **Same.**—The word "penetration" is a limitation upon and qualification of the term "carnal knowledge," mentioned in the definition of rape; and by "penetration only" the Legislature evidently intended to eliminate the question of "emission" in such cases; hence the omission to charge article 532, Penal Code, if prejudicial at all, might be prejudicial to the State, and it can not be conceived how such a charge could redound to the benefit of defendant.

APPEAL from the District Court of Bell. Tried below before Hon. W. A. BLACKBURN.

The indictment in this case contained three counts: first, that defendant did ravish and have carnal knowledge of Leonor Gutierres, a female under the age of 12 years; second, that defendant did, by force and threats, and without her consent, ravish and have carnal knowledge of said Leonor Gutierres, a woman; and third, that defendant did attempt to ravish said Leonor Gutierres, a female under the age of 12 years. The case was tried alone upon the first count, and defendant was convicted

upon that count, his punishment being assessed at imprisonment in the penitentiary for a term of seven years.

The following is the evidence adduced at the trial:

Leonor Gutierres, sworn, for the State, said:   My name is Leonor Gutierres.   I live with my grandparents, on Mr. Ben D. Lee's place, near the town of Belton.   I know the defendant.   First met him at Mr. Hastrick's place in June, 1893.   I am not quite 11 years old.   I know I am nearly 11 years old, because my grandmother has always told me so.   The defendant ravished me on the morning he was arrested—on or about the 9th of June, 1893.   It occurred before breakfast, down by the trough, near the crib.   Polly Gutierres was present.   I cried.   I told my grandmother.   She cried, but did not whip me.   The defendant outraged me on the morning of his arrest.   Polly was present.   She asked me to go down to the crib with her.   When we got down there, defendant caught me around the waist from behind and threw me down.   Polly held my hands, and put her hand over my mouth, and I could not halloo.   The defendant pulled up my dress and pushed my legs apart, and inserted his male member into my female organ, and he had sexual intercourse with me.·   His male member entered my private parts nearly a finger's length, I think.   It hurt me, and caused me to bleed.   I did not consent for defendant to have intercourse with me.   Polly told me if I told it, grandma would whip me.   I told the interpreter, at the examining trial before Judge Estill, just as I have stated here, that Polly was present, and assisted the defendant to ravish me.   I don't understand English at all, and can't say what the interpreter, Martines, told the court on examining trial.

I recognize the underskirt here in evidence.   It is the same I had on on the day of the outrage.   I had on no drawers.   The place where it occurred was in plain view of the house, and about one hundred yards away.   Grandmother and Ferdinando were in the house at the time the outrage occurred.   I have not told any one that defendant ravished me the day before he was arrested.   This was all in Bell County, Texas, June the 9th, 1893.   I never had monthly sickness before the defendant ravished me, and never have since.   The blood on my skirt here came from my private parts after defendant had intercourse with me.   I was here in Belton on examining trial the same day defendant was arrested.   I was sick about one week, and in bed part of the time, after I went home from examining trial.   I had never had sexual intercourse with any one before defendant ravished me.   I came to the examining trial on the day of the rape, in a wagon.   Polly came and returned in the wagon with me.   Polly is my aunt by marriage.

Dr. W. N. Rogers sworn, for the State, said:   I am a physician.   I know the girl Leonor.   I was at the examining trial in this cause before Judge Estill about June 9, 1893.   I examined the witness Leonor on the

day of examining trial. Her private parts had without a doubt been penetrated by the male member of a man, recently before my examination; and I think it had been entered before that. I did not find any laceration of the outer surface. Laceration may have occurred to some membrane higher up than I could see. I could see up about three inches. I found clots of blood in the privates. Could not say whether it was menstrual flow or not. Her private parts were swollen a little. I could easily insert my two fingers into it, and when I did so she flinched a little, as it hurt her some. From her physical development, I would judge her to be 12 or 14 years old, but her mother's testimony as to her age would be better than my opinion. I would rather take her statement of her age than my opinion. I had no instruments at the examination I made. I just took her into the back room of the court house, and laid her down on the floor and made the examination there. I understood, at the time I examined, that the old lady was Leonor's mother. I understood so from her. She told me on the examining trial that Leonor was not yet 11 years old.

Old lady Gutierres, sworn, for the State, said: I am the grandmother of the witness Leonor. I know the defendant. He is the man my granddaughter says raped her. Leonor told me that the outrage occurred the morning of the 9th of June, 1893. I noticed Leonor crying all day the 9th. She would not tell me what was the matter. I examined her clothing the next morning, and found blood on them, and I knew that there was something wrong, and I told Leonor if she did not tell me what the matter was I would whip her. Then she told me about the outrage. I then made Polly tell me about it. Leonor's mother is dead. She has been dead about a year. I have raised Leonor. Her mother gave her to me when she (Leonor) was a baby. She is not quite 11 years old. I had her baptized by a priest, and he gave me a certificate of her birth and baptism, which I have yet. Leonor was born in Corpus Christi. I was living at Cotulla at the time. I was not present at her birth, and do not know the year she was born. It is on the certificate given me by the priest. I can not read. I did not whip Leonor to make her tell about the outrage. I did not put a rope around her neck and hang her up, and whip her with a quirt. Leonor never had monthly sickness before the 9th of June, 1893. She has never had her monthly sickness since. On the morning defendant was arrested, I did not see blood on Leonor's bed, but I did see blood on her undershirt that is here in court. As soon as I learned of the outrage, I called the men folks from the field and had defendant arrested, and officers in town notified, and I struck defendant over the head with a six-shooter. The defendant was arrested on June 10, 1893, and examining trial held the same day. Leonor did not wash or do any work on the day of the outrage.

Old man Gutierres, sworn, for the State, said: I am the grandfather of the witness Leonor. Polly is Leonor's aunt by marriage. Martines is

Polly's father.  He lived with me before the outrage and since till about one month ago.  We are good friends.  Leonor is 11 years old on the 7th of November, 1893.  I was not present at her birth.  She was born on the 7th of November, 1882, and was baptized on the 19th of November, 1882.  I was present and saw her baptized.  She has lived with me ever since.  Her mother is dead.  Leonor said that the defendant ravished her on the day before he was arrested.  I have the certificate given my wife by the priest when Leonor was baptized.  My wife has kept the certificate from then till now.  I can not read.  (Certificate offered in evidence, and excluded on objection by defendant.)  When I first heard of the outrage, I was in the field at work, just after breakfast.  I and the men at work with me went to the house and arrested defendant; held him till the sheriff came.  My wife hit defendant over the head with a pistol.  We came on to the examining trial same day he was arrested.  Defendant was living in my yard at the time, and remained there from the time of outrage to time of arrest.

Polly Gutierres, sworn, for defendant, said:  I lived with old man Gutierres on the 9th day of June, 1893, in Bell County, Texas, when Leonor says the defendant committed a rape upon her.  Her charge against the defendant is false.  We were down at the crib by the trough, on the 9th day of June, 1893, in the afternoon.  The defendant came up and caught Leonor around the waist from behind.  I was scared and tried to halloo.  Leonor said, "Don't halloo," and defendant turned her loose, and she and I went to the house together.  On the way to the house Leonor told me that she had allowed men to have carnal intercourse with her.  She told me the next morning, after the alleged rape, defendant had had carnal intercourse with her before this.  I did not see Leonor cry that day.  She was all right, and helped me wash.  The next morning her grandmother discovered blood on Leonor's clothes.  She asked Leonor what caused it.  Leonor told her that she fell over a tree and hurt herself.  The old lady then whipped her with a quirt, and hung her up with a rope, and Leonor still told her that she hurt herself.  The old lady whipped and hung her up again.  Then Leonor told the old lady that defendant had raped her.  The old lady then made me tell the same tale.  Then the old lady struck the defendant over the head with a six-shooter.

Cross-examined:  We all came to court the day defendant was arrested.  Before the examining trial I was in the district attorney's office and told him, in the presence of the sheriff, that me and Leonor were down at the crib by the trough; that defendant came up from behind, and caught Leonor around the waist, threw her down, pulled up her clothes, got on top of her, and "did it" to her in my presence.  I said I saw the motion of his body as he was "doing it" to her.  I was afraid of the old lady, is what caused me to make the statement to the district attorney.

The old lady was in the attorney's office at the time I made the statement to him. I speak English well. I talked to the district attorney in English. The old lady is a Mexican, and can't speak a word of English. She could not understand a word I said to the district attorney. After having talked with Mr. Shannon, the district attorney, I went to Judge Estill's office to the examining trial. Was there placed on the stand as a witness, after being sworn. I swore on the stand the same that I had told the district attorney. The reason that I did it was that I was living with the old lady and was afraid of her. In July, 1893, I was called as a witness before the grand jury in this case. There was no one present but the grand jury, Mr. Lee, the county attorney, and Mr. Shannon, the district attorney. I was sworn by the grand jury and testified before that body. I swore the same there that I had told the district attorney in his office and had sworn before the examining court. I swore it because I was afraid of the old lady. I moved away from the old lady's house the next day after the examining trial, and have not lived with her since. I had been living away from the old lady's house about one month when I was called before the grand jury. I did not say a word in the grand jury room or on the examining trial about the old lady whipping Leonor and hanging her up with a rope to make her tell. I swore falsely before the examining court and before the grand jury. The statement I made to the district attorney was false. What I am swearing now is true. I did not halloo when defendant caught Leonor around the waist. I was afraid of that old lady. I can't halloo now, and the reason I can't halloo now is because I am afraid of that old lady. Defendant did not rape Leonor when I was present. I did not hold Leonor for defendant to ravish her. I am Leonor's aunt by marriage. I am not related to defendant. The old lady, the old man, nor Leonor speak English. If I was to open my mouth here now and try to halloo I could not do it, because I am afraid of that old lady.

The testimony of the other witnesses in the case is not deemed of such material importance as to require its reproduction.

No briefs for appellant found with the record.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of rape upon a child under the age of 12 years.

1. A special charge was requested, and properly refused, to the effect, that while a conviction for rape can be had on the uncorroborated testimony of the prosecutrix, yet where corroborative " testimony can be procured its nonproduction should tell seriously against the State."

Pretermitting a discussion of the form of this requested charge, we find no error in its refusal, because the evidence of corroboration is strong, cogent, and upon every material issue. A failure to corroborate the testimony of the injured girl was not an issue in the case.

2. The court omitted to charge the jury in accordance with the provisions of article 532 of the Penal Code, that "penetration only is necessary to be proved upon a trial of rape." Exceptions were reserved to such omission. The jury were instructed, that in order to convict, they must believe the defendant "did, by assault, ravish and carnally know" the prosecutrix. The charge, as given, was certainly favorable to the accused. Under such an instruction any jury would understand that "carnal knowledge" carries with it the idea of sexual intercourse, and this, as understood in common parlance, means a completed act of coition. It is difficult to understand how "carnal knowledge" of a woman by a man could be had without penetration. In Burke's case this court said, "the words 'carnal knowledge' have a meaning as well understood in common acceptation as any other ordinary expression, and are covertible or interchangeable with the words 'sexual intercourse,' as used in our language." Burk v. The State, 8 Texas Cr. App., 336.

In McMath's case, the Supreme Court of Georgia said: "When a man is charged with the offense of rape, which is defined by law to be the *carnal* knowledge of a female forcibly and against her will, the charge of 'carnal knowledge of a female' is sufficiently definite and distinct to enable the jury to understand the nature of the offense, without specifying the particular manner in which that carnal knowledge was had." 55 Ga., 303.

It is not the rule now, that the State must prove "sexual intercourse," or a complete act of "carnal knowledge" of the woman, as a basis of conviction. "Penetration only is necessary to be proved upon a trial of rape" in this State.

The word "penetration" is a limitation upon and qualification of the meaning of the term "carnal knowledge," as used in article 528 of the Penal Code, defining the offense of rape. In limiting the "carnal knowledge," mentioned in the definition of rape, to "penetration only," the Legislature evidently intended to eliminate the question of "emission" in such cases. The statute was therefore intended to be beneficial to the prosecution, and it was enacted for that purpose.

How the provisions of article 532 can redound to the benefit of the accused would be difficult to conceive, and we are of opinion that a failure to give it in charge would be prejudicial to the State.

The evidence is sufficient. The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.