W. A. JONES, ALIAS G. D. WILKINS, v. STATE.

No. 1090. Decided October 25, 1911.

Rehearing denied December 13, 1911.

1.—Murder—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence sustained the conviction, there was no error.

2.—Same—Evidence—Bills of Exception.

Where, upon trial of murder, the bills of exception, in the record on appeal, with reference to the admission of testimony and the questions propounded by the district attorney, were either defective or explained by the judge, there was no reversible error. Following James v. State, 62 Texas Crim. Rep., 610, and other cases.

**3.—Same—Evidence—Name of Defendant—Bill of Exceptions—Motion for New Trial.**

Where, upon trial of murder, no exceptions were taken during the trial to the testimony that defendant went under an alias, it was too late to raise and present this question on motion for new trial; besides, no injury was shown.

**4.—Same—Jury and Jury Law—Name of Juror.**

Where, upon trial of murder, defendant complained in his motion for new trial that one of the jurors had a different name than appeared on the jury list of the special venire with which he had been served, and it appeared from the record on appeal that the defendant's counsel was well acquainted with said juror and heard the name of the juror read when the verdict was brought in, etc., the objection came too late in his motion for new trial; besides, no injury was shown.

**5.—Same—Argument of Counsel.**

Where, upon appeal from a conviction of murder, the court's qualification to the bill of exceptions, with reference to the argument of State's counsel, showed that the remarks complained of were either not made or, if made, no injury accrued to the rights of defendant, there was no error; besides, no charges were requested to withdraw the same.

**6.—Same—Charge of Court—Murder in the First Degree.**

Where defendant was convicted of murder in the second degree, he could not complain of the court's charge on murder in the first degree.

**7.—Same—Charge of Court—Harmless Error—Words and Phrases.**

Where, upon trial of murder, the court in his charge on murder in the second degree used the words "in a passion aroused without adequate cause" inadvertently, the evidence not raising such a question, the error was harmless, as it placed a greater burden on the State than required, and under Article 723, Code of Criminal Procedure, there was no error. Following Combs v. State, 52 Texas Crim. Rep., 613.

**8.—Same—Charge of Court—Principals.**

Where, upon trial of murder, the evidence showed that the defendant acted with another in the commission of the offense, there was no error in submitting the law of principals.

**9.—Same—Charge of Court—Means Used.**

Where, upon trial of murder, the court submitted to the jury the different means used by the defendant in committing the offense, there was no error.

**10.—Same—Charge of Court—Principals—Article 723.**

The proper construction of article 723, Code Criminal Procedure, as it now stands, does not authorize the Court of Criminal Appeals to reverse a judgment even though there may be some technical omissions or commissions in the court's charge, and where, upon trial of murder, the court submitted the law of principals as applied to the facts, and no charge was requested on this subject, there was no reversible error.

**11.—Same—Charge of Court—Accomplice.**

Where, upon trial of murder, the evidence did not show that the State's principal witness was an accomplice in the killing of her child, but the court nevertheless submitted a proper charge on the question of accomplice as to her testimony, there was no error in refusing requested charges that she was an accomplice.

Appeal from the District Court of Lamar. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Allen & Dohoney and B. B. Sturgeon,* for appellant.—On question of argument of counsel: Conn v. State, 11 Texas Crim. App., 390.

On question of court's charge on means used: Walker v. State, 42 Texas, 360.

On question of court's charge on murder in the second degree: Combs v. State, 52 Texas Crim. Rep., 613, 108 S. W. Rep., 649.

On question of the court's charge on principals: Conn v. State, 11 Texas Crim. App., 390; Lynch v. State, 6 S. W. Rep., 190; McAlister v. State, 76 S. W. Rep., 760; Criner v. State, 53 S. W. Rep., 873; Bogan v. State, 90 S. W. Rep., 171; Ross v. State, 10 Texas Crim. App., 455; Bow v. State, 31 S. W. Rep., 170; Dawson v. State, 41 S. W. Rep., 599; Yates v. State, 42 S. W. Rep., 296; Bell v. State, 47 S. W. Rep., 1010; Parnell v. State, 98 S. W. Rep., 269; Guffee v. State, 8 Texas Crim. App., 187.

On question of accomplice testimony: Barrett v. State, 115 S. W. Rep., 1187; Tate v. State, 116 S. W. Rep., 605; Crowell v. State, 6 S. W. Rep., 318.

On question of the court's charge on principals in failing to instruct on other parties present: Oates v. State, 95 S. W. Rep., 105; Lisskosski v. State, 23 Texas Crim. App., 169.

On question of court's charge on issue not raised by the evidence: Griffith v. State, 78 S. W. Rep., 347; Mattison v. State, 114 S. W. Rep., 24; Abernathy v. State, 114 S. W. Rep., 1178; Galligher v. State, 115 S. W. Rep., 47; Menach v. State, 97 S. W. Rep., 503; Smith v. State, 104 S. W. Rep., 899; Brittain v. State, 105 S. W. Rep., 817.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—On October 5, 1910, the appellant was indicted by the grand jury of Lamar County for the murder on July 6, 1910, of the infant child, without a name, of Willie Wilbur. He was convicted of murder in the second degree and given the lowest penalty, five years.

The indictment is in two counts, though they are not given a separate number nor are they in separate paragraphs. After the formal part, the indictment alleges that W. A. Jones, alias G. D. Wilkins, on or about July 6, 1910, in Lamar County, did then and there unlawfully and with his express malice aforethought, kill and murder an infant child of Willie Wilbur, said child being without a name, by him, the said Jones, alias Wilkins, breaking the neck and disjointing and dislocating the neck of the said infant by then and there twisting the head and neck and pulling the head and neck and jerking the head and neck, and dislocating and breaking the neck and disjointing

and dislocating the neck of said infant with his, the said Jones, alias Wilkins' hands and fingers, from which said several acts (enumerated above and reiterated), the said infant on said date did die, and on said date the said Jones, alias Wilkins, did then and there unlawfully and with his express malice aforethought, kill and murder the said infant child by him, the said Jones, alias Wilkins, pressing and mashing the head and bowels of the said infant with his hands and fingers and by dropping and placing the infant in a night glass or slop jar, from which said acts (enumerated and again repeated) the said infant did die, a better description of the means and instruments by which and with which the said Jones, alias Wilkins, did then and there kill and murder the said infant, the grand jurors can not give. ·

The above, in substance and effect, are the allegations, but not a copy of the indictment.

It takes some sixty-eight pages of typewriting to give the statement of facts. We do not undertake to give in detail this testimony, but from the whole of it, gathered by taking and combining the testimony of the several witnesses, where not otherwise stated, we will give such statement as will illustrate the points raised and discussed.

The witness, a woman, Willie Wilbur, about twenty-two years of age, had been living in Oklahoma and, it appears, on the place of Bill or W. W. Swink, for about a year prior to the commission of the alleged offense; that said Swink, during that time, had been having sexual intercourse with her, and the testimony justified the jury to believe that she became with child by him sometime in November, 1909; that about Sunday, July 3, 1910, she began to have some labor pains and she and said Swink thereupon went from where they were living in Oklahoma to the city of Paris in Lamar County, and put up at a restaurant or boarding house known as the Hignite House. Swink registered her name as Annie Ernest and his as J. G. Gentry, both from Texarkana, Texas. She was assigned to a room and Swink to one adjoining, and soon after her arrival there, went to bed and practically remained in bed until after the birth and death of her child on Wednesday night, July 6, 1910. She continued to have labor pains from time to time until after the arrival of the appellant on Tuesday afternoon, July 5th. Appellant did not register at the Hignite House when he first arrived there, although he was assigned to and occupied a room therein, but he did register on the night of July 6th, when required to do so by the proprietor of the house, first starting to write his name W. A. Jones, but before completing the word Jones, erased that and instead wrote G. D. Wilkins, from Texarkana, Texas. Swink and Hignite, the proprietor of the house, were present when he did this.

The appellant came to Paris to attend Willie Wilbur in confinement, knowing at the time that she was to be confined. He came at the instance of said Swink and attended her at his instance. He made an

examination of her Tuesday evening, soon after his arrival there, and claims that he then discovered that she was in labor and while he thought it was premature, the examination developed that the birth could not be properly prevented and he thereupon administered to her from time to time, drugs for the purpose of bringing on and inducing the delivery of the child. The labor pains continued from time to time after he reached there, made his examination and began to administer the drugs, with more or less increased severity until the child was born about 10 o'clock Wednesday night. While the women servants at the hotel waited on her and carried her meals to her Monday, Tuesday and Wednesday, visiting the room some three or four times or oftener each of these days, no one was present at the birth of the child and for some hours prior thereto, except said Swink and appellant. Soon, if not immediately, after the birth of the child, it began to cry and cried somewhat vigorously and loudly. The two women working in the house and who had been waiting on the confined woman, at once, after hearing the cries of the child down stairs where they were at work, went up to the room. The door was closed, Swink was standing with his back against it and it was not opened for sometime and not until repeated and loud raps were made thereon. Finally, when they were admitted, they saw and offered to take the child, wash and dress it, but they were not permitted by appellant or Swink to do so. At the delivery of the child, the appellant took it in his hands, one about its hips and the other about its head, had a night or slop jar, in which there was some water, removed from under a table and dropped the child into this jar. He did not then tie or cut the navel cord. The child was crying at this time. He then attempted to remove the after-birth. After letting the child remain in the night or slop jar for some time, he removed it therefrom and placed it on a table. After the two servant women were admitted into the room they discovered that the appellant had neither tied nor cut the navel cord of the child and called his attention thereto. He thereupon said to them that it was no use, "it will die any way." At this time the navel was bleeding. One of these women replied to him that he had better tie it, if he did not, she would call an officer and have him arrested in five minutes. She then picked up an ordinary twine string that she found on the floor, handed it to him and he then tied the navel cord. When the two servant women of the house offered to wash and dress the child the appellant said "no, it was not any use, it would die anyway," and he would not let them wash or dress it. These women thereupon got a counterpane and wrapped the child up in it and wanted to lay it on the bed with its mother, but the doctor said there was no use to bother with it and directed and required them to lay it back on the table, which they did. After remaining up there some ten to twenty minutes, they left the room, went down stairs, informed the proprietor of the house, Mr. Hignite, and he thereupon

went up to the room where Willie Wilbur and the child were, and called the appellant and Swink out and had the doctor register; whereupon he registered in the name and under the circumstances given above.

There was much testimony as to the state of the development of the child. From the testimony of some of the doctors and some of the witnesses who saw it, it seemed to be an almost, if not fully, developed child. It had long hair, finger and toe-nails, its mouth, nose, feet and everything were fully developed, and the testimony as to its estimated weight varied from two and a half or three pounds to as much as seven pounds. The testimony clearly justified the jury to believe that it weighed from five to seven pounds. The mother testified that no abortion was brought on, but that it was about time for the child to be born and she claimed that it was a well developed child.

Among other things, Willie Wilbur testified that after the doctor had dropped the baby in the slop jar and it had remained there some time, the two women servants, Mary Blackburn and Lula Adams, came to the door and knocked. "The baby was crying at that time. The room was closed at that time. He (speaking of appellant) didn't tie the navel string just then. He waited until there was two ladies come in, Mary Blackburn and Lula Adams (the two women servants). When they came up, the door was closed and Mr. Swink was standing with his back to the door and there was a hole in the door and Swink had stopped that with paper. The hole was right at the bottom of the door—a knot hole. They did not get in when they first came to the door; they knocked two or three times before they opened the door. After they knocked and before the door was opened, Jones, he taken the baby out of the slop jar then and laid it on the table on a cloth and then Swink he just—the baby was naked at that time. Its navel string was not tied at that time. The baby was crying at that time and its navel cord was bleeding. When they came in, Mary says to the doctor, says, 'Call your attention,' says, 'you haven't tied the baby's navel cord;' 'Well,' he says, 'there haint no use, says it will die any way,' and she says, 'You better tie it or I will call an officer and arrest you in five minutes,' and she picked a twine string up off from the floor and handed it to him and he tied it.

"The baby was laying on the table naked at that time. Mary and Lula both said they wanted to wash it and dress it and they said no, there was not any use, said it would die and they would not let them wash it and dress it. Mary Blackburn got a counterpane and wrapped the baby up in it and wanted to lay it on the bed by me and the doctor says, no, there haint no use to bother her with it, it will die any way, just lay it back there on the table, and they laid it back on the table. Mary Blackburn and Lula went on out of the room after that. They staid up there at that time, to my judgment, I would think it was about ten or fifteen minutes, something like that and they went

out of the room and went on down stairs; I suppose they went down stairs, they went out in the hall and I never heard them any more. They came back in a short time and Mr. Hignite came with them that time. The baby was still laying on the table when they returned and was still crying. Mr. Hignite called Jones and Swink out in the hall and I think, made the doctor register, I don't know. Mary Blackburn came in the room at that time and Lula stood at the door. They staid about five or ten minutes at that time, something like that. The baby was crying loud and strong at this time. When they left the room that time, that left Dr. Jones and Bill Swink in the room. The baby laid on the table a right smart while after that. The doctor taken his hand and mashed on the baby's stomach and on its head. He taken his hands just this way and mashed on its stomach and then like that was its head, just mashed its head in. Jones taken his left hand and jerked its head back and then jerked it around. The baby was still on the table at that time. I says to Jones, I says, 'You are killing my baby;' he says, 'Well, it will be the best, he says it will die any way,' and Swink says, 'Yes, it will die anyhow.' After he put one hand on its breast and the other hand on its chin and jerked its head as I have described, it never cried any more. After that he laid it on the bed by the side of me. When Jones was doing that to the baby, Swink was standing with his back against the door. When he was mashing its head as I have described, I asked him what was he doing, and he says, 'I am straightening its head, it is crooked;' and when he jerked its head back, I asked him what he was doing and he said that its neck was crooked, that he was straightening its neck. I told him that he was killing it and he said, well it was the best, that it would die any way and Swink said the same thing. When he done its head and neck that way, I don't know just exactly what time it was, it was between 1 and 2 o'clock, the best of my knowledge. That was on Wednesday night. I was in bed during all that time and was pretty weak and was flooding awful bad, the blood ran off from the bed on to the floor and run nearly to the door. Q. 'At any time before your child was born, was there anything brought up in the room by either of them, Jones or Swink, after Jones had come over here; if so, what was it?' A. 'Yes, sir, Swink brought a little telescope grip up there and pushed it in under the bed. He brought the grip up in the room Wednesday evening, along in the evening about 3 or 4 o'clock, something like that; he pushed it under the bed, back far enough under the bed you could not see it; just walking in at the door a person could not see it under the bed. After my child was born, Mr. Swink says to the doctor, says, 'You can't take it in the grip now, says, you can't take the grip now, for says, too many have seen it, too many people have seen the baby.' Lula and Mary Blackburn had been in the room and seen the baby before this conversation.

"Q. 'Now, did you hear any conversation between them, Swink and

Jones, at any time before the baby was born, with reference to any money, if so, what was it?' A. 'Why, I heard them talking out in the hall, I could not understand what all they were saying; I heard them say something about some money, I could not understand what it was nor how much, nor nothing like that. I understood Jones to say to Swink, says, "I will do this for so much money," but I could not understand just how much money that it was that he was to get. I understood them to talk about $50 at that time—pay him that much at that time—but the amount that he proposed to do it for, I could not understand.' " . . .

On cross-examination, among other things, she further testified: "The baby was born Wednesday night, between 9 and 10 o'clock. Swink and Jones was in the room when it was born. I was in bed. Dr. Jones, the defendant, delivered me of the child. He taken it from me and dropped it in the slop jar; Swink pulled the slop jar out from under the table and he dropped it in it. He taken it this way, had one hand under its head and one hand under its hips and just carried it right along on his hands that way and just dropped it right down in the slop jar, had it just about that far (showing) from the slop jar and just dropped it down. I laid there in bed and looked at them, what more could I do? I told them not to drop it in there, that they would kill it, and they said it would be the best. He did that before he put his hands on its stomach and on its head and neck. He taken it right off the bed from me and dropped it in the slop jar. It was a small slop jar, the top of it was about as big around as the top of that spittoon there; the slop jar was not a bit higher than that spittoon. The slop jar was white, just like the inside of that top there and had a handle at the side of it. The baby was crying at the time he dropped it in the slop jar. I laid there and looked at them and that is all I said and all I done. There was no light in the room, only the light from that big light out there over the wagon yard, but it was light in the room. After Dr. Jones put the baby in the slop jar, he came back to the bed there and was trying to take the after-birth and after he took it he dropped it down in the slop jar after he taken the baby out. He left it laying on the bed right with me and then when he took the baby out of the slop jar, he went and got that and put that in. When the women knocked at the door, Swink had his back to the door, had his back right against the door. The after-birth was on the bed, he just left it laying where he taken it. He taken his fingers and kind of helped the after-birth along and while he was doing that the child was in the slop jar. He was just a few minutes taking the after-birth, it might have been about five minutes, something like that. The slop jar was about half full of water. The baby laid in a slop jar half full of water for five minutes while he was removing the after-birth.

"Q. 'Then he left the after-birth on the bed and went and took the child out of the slop jar?' A. 'He didn't until them women come. After he taken the after-birth, he went and took the baby out of the slop jar and laid it on the table. He picked it up by its head and feet, just put his hand under its head and caught hold of its feet and laid it on the table. Its head kind of swung over his hands. His hands were under its neck both times, when he put it there and when he took it away. The baby laid in the slop jar for five minutes and cried strong all the time. He had not fixed its navel cord, he hadn't done a thing to it. After he put it on the table why he went back then and got the after-birth from me and put it down in the slop jar and then them women came to the door and knocked two or three times and Swink opened the door and let them in and Mary says to the doctor, says, 'Doctor,' says, 'I will call your attention, you have not tied the baby's navel cord;' he says, 'Well, there haint no use, it will die anyhow,' and Swink says, 'Yes, it will die anyway,' and Mary picked up a string off from the floor and handed it to him and he tied it, and she wanted to wash and dress the baby and they said no, it was not any use; Dr. Jones says, 'No, there haint any use, it will die anyway,' and Swink says, 'Yes, it will die,' and Mary got a counterpane and wrapped the baby up in it and wanted to lay it on the bed with me and they said, 'No, don't bother her with it, it will die anyway,' and they staid in there then I guess ten or fiften minutes. Mary says, 'I will go down stairs and get some water and we will wash and dress the baby,' and the doctor says, 'No, says there haint any use, says it will die.' That is all I remember of them saying. Mary and Lula Blackburn went on out there. I don't remember just what time that was, it was nearly 10, I guess, may be after 10, when this occurred, I didn't have any clock in the room. They went away and left me and Swink and Dr. Jones in the room and Jones taken his hands and mashed on the baby's bowels and stomach. The baby was laying on the table when he did that. He taken both of his hands right on its stomach and mashed down on it and then he taken his hand like that (showing) on its head and mashed in on it—the soft part of his hand. I was laying there looking at that and I says, 'You are killing my baby;' he says, 'Well, it is the best, it will die.' I cried then, of course, I didn't holloa, I was not stout enough to holloa. When he put his hands on its stomach and took its head this way, I asked him what he was doing and he said its head was crooked and he was straightening it. After he did that the baby cried on but not as strong as it had been crying, it got a right smart weaker than what it was. It didn't cry very long after that, about five minutes I reckon, something like that. He taken his hand then and put it here on its breast and jerked its head up and jerked it around. It was still lying on the table and he just went up to it then and put his hand on its collar bone right there and took it by the chin and jerked its head up that way and jerked it around

this way and then around that way. I says, 'You are killing my baby;' he says, 'Well, it is the best, he says, it will die,' and Swink said the same, 'it is going to die anyhow.' The baby didn't cry any more after that and they taken it off from the table then and laid it on the bed. This was between 12 and 1 o'clock. I never heard it cry any more after that. The women had been gone out of the room sometime when that occurred, I don't know just exactly how many minutes or anything like that, but they had been out a right smart little bit.' " . . .

She further testified on redirect examination: "Jones wanted to leave that night after the baby was killed. I heard Jones and Swink talking and Jones says, 'Get me a little grip and says when it comes, why says, I will put it in and drop it off by the side of the railroad, drop it out of the window.' He said, just get a little small grip, that it would not be much bigger than a rat. . . . I first saw the grip shown me, when Swink brought it into the room and pushed it under the bed, down at the place where I was stopping. . . . The time I heard the conversation about taking the baby and putting it in a grip and Jones would carry it off and drop it by the side of the railroad, was on Wednesday afternoon before it was born Wednesday night. I don't know how Jones knew that it would not be bigger than a rat. . . . . When they was talking about carrying it off in a grip, I told them if it was alive they was not going to carry it off in no grip, and it was born alive."

The appellant showed several contradictions in the testimony of the witness, Willie Wilbur, on this trial, from what she had previously testified to in an examining trial and a habeas corpus hearing theretofore. Especially, about the time of her conception, showing that at different times she had made it in January, 1910, and December, 1909. There were other contradictions also shown. All these matters, however, were for the jury.

There was also much testimony by several physicians and other parties who saw and examined the child after it was dead and before its burial. It then seems to have been exhumed twice, once only one or two days after its interment and the last time perhaps as long as five days after its first interment.

This testimony clearly justified the jury in finding and believing that the head of the child had been mashed in; that its neck had been broken. One of the witnesses who was present and saw it when it was first disinterred and when the doctors were examining, expressed it this way: "The baby's neck seemed to be dark like it was blood-shotten all down next to the base and as the doctor would handle it, its head would fall in every direction; it had the appearance of being broke; he took it by the hair—it had long hair—he worked its head up and down like a ball with a rubber string to it, something like that;

it worked straight up and down. Right around just above the collar bone it seemed to be blood-shotten."

This doctor, who examined it on this disinterment, among other things, testified that he made an examination, and said: "Its neck was broken just at the base of the skull, where the skull and neck joins there and there was some discoloration on the breast just about along there, about the collar bone like, it was purple like there might, have been some pressure there, discoloration about the collar bone, right on the breast, right along these bones here. . . . Its head had been mashed, the sutures running across here they were mashed down; when I put my hand on it that way I discovered a little division there like it had slipped down and I put my hand on it very easily, it went down and bloody water oozed out of the nose and when I would press here, fresh looking blood would come out of the nose and I noticed then that these sutures here were separated, had been broken down. . . . With a child's neck broken, as I found from my examination of this baby's neck, that would produce death; I don't think he would live very long under that condition. . . . Q. 'If, by placing one hand on the breast bone at the point where you saw the bruises and taking the child then by the chin with the other hand, the child laying on the table, and by jerking its head back and to one side, to either side, would that break its neck, could it be broken that way?' A. 'Well, I presume it could, but if its head was lying on the table it would be very difficult to break it in that position, but if its head was off the table so it could be drawn back, do it very easily, especially being drawn back and twisting its head, there would be so many ways a person might do it, throw it back and twist the head or throw it far enough back it would, I presume, unjoint the bones; this was considerably apart, I showed it to the gentlemen who were present; I just took hold of the head that way and just took it up and you could see, you could insert your finger; I didn't cut down in the neck, it was too plain a case, because I didn't think it was necessary to cut down on the neck, because just lift it that way and its head was just limber that way, just bend it around that way.' "

Another one of the physicians who testified as to the examination of the child on its second disinterment, showed that they cut down on the baby's neck and found it was broken at the base of the skull. The vertebra bones were separated something like three-quarters of an inch, conservatively speaking. The neck was broken right where the backbone joins on to the skull, just at the base. Others who saw the child on this occasion, testified substantially as some of these doctors.

Besides the corroboration of the witness, Willie Wilbur, as shown by the testimony of the doctors who examined the child, and others who were present and saw this examination, she was also corroborated in her testimony by the two servant women, Mary Blackburn and Lula Adams, as to what was done and said in their presence and hearing on

the occasion and especially the two after the birth of the child when they were present that night after its birth. One of these women also corroborated her about Swink having carried to her room on Wednesday evening the telescope grip, she having seen him take it in at a door, an unusual way to go into the house. We deem it unnecessary to recite their testimony.

The appellant testified and disputed Willie Wilbur practically in all her testimony about what was done and said by him, her, and the two servant women, as she and they had testified was done and said. He contended by his testimony that he was merely called as a physician and simply and solely acted as such in the case of the confinement of the woman. He claimed that he had known Swink and was intimate with him for several years before this occasion. That he had known Willie Wilbur for only a short time before this occasion. He claimed to have seen her and Swink at a town in Oklahoma on Sunday evening prior to their going to Paris, Texas, and had examined her on that occasion. He had a woman and her daughter at this town in Oklahoma to support his testimony as to his and Willie Wilbur and Swink being together on this occasion. Willie Wilbur disputed all of his and their testimony on this point. The State introduced several witnesses who testified that they knew the general reputation for truth and veracity of the said two Oklahoma women and that it was bad. It is unnecessary to state further of the testimony.

One of appellant's contentions in the case is that the testimony is not sufficient to sustain the verdict. We have carefully gone over and considered the evidence time and again and it is our opinion that the testimony not only amply sustains the verdict, but we think it would have sustained a conviction of the appellant for a higher offense or at least for a much greater penalty than was inflicted upon him.

Appellant has twenty bills of exceptions in the record, all of which are presented by his brief. We will give the whole of the first, omitting the style of the case, the court and the signature of the judge: "Be it remembered that on the trial of the above entitled cause the following proceedings were had, to wit: Willie Wilbur, a witness for the State, being on the stand, the following question was asked said witness by the district attorney: 'Who came with you when you came to Paris?' Defendant objected to the question on the ground that same was irrelevant and immaterial and was a transaction that occurred between the witness and Bill Swink in the absence of the defendant. The court overruled the objection and permitted the witness to answer the question, as follows: 'Bill Swink came to Paris with me; we got here on Sunday night and stopped at the Hignite rooming house.' Counsel for defendant then and there, in open court, excepted to the action and ruling of the court and here presents this, his bill of exception No. 1, and prays that same be allowed by the

court and made a part of the record in this cause." In allowing the bill, the judge thus explained it:

"Bill given with the explanation that the testimony shows by defendant himself that he came to Paris at the invitation of Swink and that he saw the witness and Swink at Hugo some day or two before he (defendant) came to Paris."

The next four bills of exceptions are equally as defective as this. They are to some isolated question to and answer of the same witness. The second is, "What was your condition with reference to being in a family way?" to which she replied, "Yes, I was in a family way and it was nearly time." The judge, in allowing this bill, qualified it by stating that the defendant himself testified that he examined the witness, Willie Wilbur, at Hugo, before he came to Paris and found she was pregnant. The third is, "When did you become acquainted with Bill Swink, alias Gentry?" to which she answered, in October, 1909, that she was living on his place. The judge qualified this bill by stating that the testimony of this witness shows that Swink was the father of her child. The fourth is, "Who was the father of your child?" A. "Bill Swink." This bill was qualified as follows: That the defendant himself testified he examined the witness and found her pregnant. The fifth is, "You say that after they broke its neck, they put it in bed with you and you then went to sleep?" A. "Yes sir." This bill was qualified by the judge as follows:

"That the witness had testified that the defendant put his hands on the collar bone of the baby and jerked its head up and jerked it around and that it was still lying on the table and he went up to it and put his hand on its collar bone right there (pointing to her own person) and took it by the chin and jerked its head up that way (showing how he jerked its head with her own person) and jerked it around this way and then around that way (again showing how it was done) and she said to him (defendant), you are killing my baby, and he says well its the best, it will die, and Swink said the same, it's going to die anyhow. The court will see from the testimony of Dr. Moody and Lewis that the child's neck was broken."

The 6th, 7th and 8th bills are to several questions and answers propounded to the witness, Hignite. In the 6th, after he had testified to having the defendant sign his name to the hotel register, he was asked as to the condition of the defendant and one Bill Swink at that time, to which he answered that they looked a little bit excited and asked him why he had done that. This bill was qualified by the judge as follows: "That when the district attorney asked the witness about the defendant coming to his house and he and Swink registering, he then answered as above and he also testified that he told them (defendant and Swink) that they had not registered and that if there was anything crooked about it, he would see that they paid for it."

The 7th is, that he was asked how Bill Swink registered at his house

for himself and Willie Wilbur, she being registered under the name of Annie Ernest. He answered that Bill Swink had arrived on Tuesday afternoon and the defendant registered for himself (meaning Bill Swink) as J. G. Gentry and the woman as Miss Annie Ernest. This bill was qualified by the judge as follows: "That the defendant and Swink were together at Hugo a day or two before they came to Paris with the witness, Willie Wilbur, and defendant had examined her and found her pregnant and that he came to Paris at the solicitation of Swink; the court will observe that this thing about the registering of their names was before the alleged killing and the defendant himself testified that they told him they had registered there from Texarkana, and that he gave one of the prescriptions for J. G. Gentry and knew his name was Swink."

The 8th is, said witness was asked whether or not the defendant paid his bill when he left. The witness replied that he did not. This bill was qualified by the judge as follows: "That the defendant had testified he left town (Paris) without his breakfast, on the morning after the night the child was alleged to have been killed and the district attorney asked him, "Left without paying any bills?" and he answered, "I made arrangements for my bills to be paid, I made arrangements with Lula (Mrs. Adams) and told her that Mr. Swink would pay the bill and she said it was all right." Each of these bills are equally as defective as the first five and can not be considered by this court.

The 9th, 10th and 11th are as to questions and answers of the doctors, two by Dr. Moody and one by Dr. McCuistion. The 9th is, "I will ask you, doctor, whether or not, by placing one hand on the breast at the point where you saw the bruises and taking the child by the chin with the other hand, the child lying on the table, and by jerking the head to one side, or either side, would that break the neck, could the neck be broken that way?" to which he answered, "I presume that it could." This bill was qualified by the judge as follows: "That witness had testified that he was a practicing physician and had been such for 56 years, and that the child's neck had been broken and that there was discoloration on the collar bone and breast and it was purple like there might have been some pressure there; the witness answered as above set forth and in the same sentence, further answered: But, if its head was lying on the table, it would be very difficult to break it in that position."

The 10th is, after stating that he did not cut into the child's neck on the occasion when it was first exhumed, he was asked why he did not cut into its neck, to which he answered, it was too plain a case, because he did not think it was necessary to cut down into the neck. I could tell it was broken without cutting down into it. In allowing this bill, the judge qualified it as follows: "When counsel for State asked the question, the counsel for defendant said: We object to it

being too plain a case and we except to that testimony, and the court then asked what it was the witness said, and counsel for defendant then said, 'he (the doctor) said it was too plain a case for him to cut into, and I object to it; it is a matter that could be detailed to the jury and let them determine about that.' Counsel for defendant never asked that it be excluded from the jury, the witness simply gave that as his reason why he didn't cut down into it."

The 11th is to the testimony of Dr. McCuistion, wherein the defendant asked him whether or not it was a fact that any reputable physician, being called upon to deliver any illegitimate child, would attend the case and would also consider it part of his duty to conceal the same and also the identity of the woman, in order to save the shame of the woman. This was objected to by the State and the witness not permitted to answer. The appellant claimed that he expected the witness would testify that all reputable physicians would accept such a call; that they would go and see any woman in labor at any time and place and would do everything in their power for the woman and the child and also would do everything to keep the matter a secret.

These bills are equally as defective as the others and can not be considered by this court. James v. State, 62 Texas Crim. Rep., 610, 138 S. W. 612; Conger v. State, Baker v. State, and other cases recently decided; White's C. C. P., secs. 857 and 1123.

The 12th bill was to this question, asked by the defendant's counsel, of defendant's witness, Charles Minton: "Now, I will ask you whether or not it is a fact that the place where they lived (referring to the State's witnesses, Mary Blackburn and Lula Adams), whether complaint has been made of the kind of place they were running, and whether or not it is a fact that men have been going there at all times of the night to such an extent that you were called upon to move them?" On objection by the State, the court sustained it and the defendant stated that he expected the witness to state that complaint had been made to him of the character of the house the women were running and that he had notified them that they had to move and they did move. The court allowed this bill with the explanation that the defendant proved by this same witness that he knew the general reputation of these two women for chastity and morals and also the reputation of the house they occupied and lived in and that it was bad.

The 13th was a question to the defendant's witness, Carter, wherein he was asked the same question as the above question to Minton and it was stated that the defendant expected to prove the same by him as he did by Minton. The bill was allowed with the same qualification to this as to the 12th bill above.

The 14th was that, after defendant's witness, Neal, had testified that he had been employed to represent Willie Wilbur, in reference to her claim as a member of the Choctaw Tribe of Indians before the Land Commission of the Indian Territory, and that she was registered

under the name of Willie Ernest, and that he had made trips to Musko-
gee in connection with said business, he was asked by the district at-
torney on cross-examination: Q. "Who first talked to you about
making the trip up there, that is, the time you speak of?" which was
objected to as not in rebuttal of anything they had brought out and
the answer would be immaterial and irrelevant. The court overruled
the objection and the witness answered that his firm had been employed
by Bill Swink to represent Willie Ernest in that matter. The court,
in qualifying the bill, stated that from this witness' testimony, the
court will see, that he told about going up to Muskogee in his direct
testimony.

The 15th bill shows that the defendant, having been indicted as W.
A. Jones, alias G. D. Wilkins, at the beginning of the trial, appellant's
counsel stated to the court that his name was W. A. Jones; that he
had always gone by said name and had never claimed to be G. D.
Wilkins or gone by said name; that he had no alias and asked that
he be prosecuted under his real name, which is W. A. Jones; that the
court stated he would enter an order directing that defendant be prose-
cuted under his name, W. A. Jones, but after making such order in
open court, the court failed to enter such order and in his charge to
the jury, referred to defendant as W. A. Jones, alias G. D. Wilkins.
That defendant, in his motion for a new trial, by the fourth ground,
raised said question and asked that a new trial be granted on account
of these matters. The court overruled the motion for new trial and
defendant excepted. This bill is allowed by the Judge with this expla-
nation: "That the jury to try this case was obtained late one evening,
and the district attorney read the indictment and the defendant en-
tered his plea of not guilty and the court then adjourned until next
day and the next day the State commenced to introduce its testimony
and while the district attorney was examining a witness, the district
attorney called the defendant, Jones, alias G. D. Wilkins, and then it
was that counsel for defendant suggested that defendant's name was
W. A. Jones and asked that he be prosecuted under that name alone
and that his name was not W. A. Jones, alias G. D. Wilkins. The
defendant himself testified that he registered at Hignite's as G. D. Wil-
kins." It will be seen therefrom that no exception was taken during
the trial of the cause as to the appellant being called W. A. Jones,
alias G. D. Wilkins, anywhere in the examination of the witnesses,
the trial of the cause, or the charge of the court, and it was too late
to raise and present this question on motion for new trial. Besides
this, the appellant is in nowise shown to have been injured under the
circumstances stated.

The 16th bill complains that on appellant's motion for a new trial, he
offered in evidence the special venire list and list of jurors empaneled
to try said cause, showing that the name of W. C. Brackeen was drawn
upon said venire and that W. C. Brackeen was served with the venire

writ and summoned to serve upon said case as a juror and that no person by that name was so drawn or summoned. The verdict of the jury was also introduced which was signed, W. C. Brecheen, foreman. It also appeared upon the hearing of said motion for new trial that the person so acting as foreman answered the name of W. C. Brackeen and was duly qualified, selected and sworn as a juror in said cause; that the court overruled the motion for new trial and the appellant excepted. This bill was allowed by the court with this explanation: "That W. C. Brackeen was drawn on the venire and served upon the jury and was the foreman of the jury and signed the verdict and signed it W. C. Brackeen, and he testified by affidavit that he signed the verdict in this case and the said W. C. Brackeen handed the verdict to the court when the jury came back after considering the case. The controversy in this bill arises from the fact that Mr. Brackeen signs his name so that it looks somewhat like Brecheen. Counsel for defendant had known Mr. Brackeen for years and knew that he was on the jury and accepted him as one of the jurors to try the case and were present when the verdict was brought in and saw him hand the verdict to the court and heard the verdict read and Mr. Brackeen's name read out by the clerk as foreman and made no objection whatever." It was too late to make any such objection on motion for new trial. Besides, with the explanation of the court, no injury whatever is shown to have occurred or could possibly have occurred to the appellant by reason of the mis-spelling, if so, of this juror's name.

The last four bills, seventeen, eighteen, nineteen and twenty, are objections to the claimed remarks of the attorneys for the State in argument to the jury. It is unnecessary to quote these claimed remarks. On the hearing of the motion for new trial, the court heard evidence thereabouts and the attorneys for the State denied, in substance, making the remarks as claimed by the bills. The court thereupon refused to allow the bills, showing in explanations to each of them, in substance, that the remarks were either not made, or where any of them were in substance made, they, in no way, injured the appellant, and showing also that the evidence justified the remarks where they were made.

The appellant asked no special charges to exclude any or all of these claimed remarks in argument by the State's attorneys. The verdict of the jury fixed the penalty of the appellant at murder in the second degree and gave him the lowest penalty thereunder. No injury whatever is shown to have occurred by these remarks, even if they were made, and by the appellant failing to ask special charges to exclude them, they were certainly, at the time, not deemed of sufficient importance to do this, which was required, under the law, in order that the questions might be properly considered by this court. We desire to say that notwithstanding the bills of exceptions above quoted present questions so defectively that this court can not consider them, yet, in

connection with the record, in our opinion, not one of them presents any reversible error even if the questions attempted to be raised thereby had been properly presented.

There are about thirty grounds in appellant's motion for a new trial. In them he complains of the various matters shown by his bills of exceptions above noted and in addition thereto the refusal of the court to give two special charges requested and complains of the court's charge in some particulars.

Among the complaints of the charge of the court is one to paragraphs ten and eleven, as to the charge of the court about murder in the first degree. As the appellant was acquitted of this and given the lowest penalty for murder in the second degree, whatever errors, if any, may have been in said charge about murder in the first degree, can not and did not affect the appellant.

The fifteenth, sixteenth and seventeenth paragraphs of the court's charge are as follows:

"15. If you believe from the evidence, beyond a reasonable doubt, that the defendant, with his implied malice, as that is hereinbefore explained, in a passion aroused without adequate cause did, either alone or acting together with Bill Swink as a principal, as principal is hereafter explained to you, in Lamar County, Texas, at or about the time charged in the indictment, unlawfully kill and murder the infant child of Willie Wilbur, by then and there breaking its neck and disjointing and dislocating the neck of said infant child by twisting the head and neck and pulling the head and neck of said infant child with his (defendant's) hand and fingers, and if you further so believe that the said infant child was without a name, and if you believe from the evidence, beyond a reasonable doubt, that the defendant, either alone or acting together with Bill Swink, as a principal, as that term is hereinafter explained to you, did, in Lamar County, Texas, at or about the time charged in the indictment, with his implied malice aforethought (as that is explained) in a passion aroused without adequate cause, unlawfully kill and murder the infant child of Willie Wilbur by pressing and mashing the head and bowels of said infant child with his hands and fingers and by dropping and placing the child into a night glass or slop jar, and you further so believe that the said infant child was without a name, then you will find the defendant guilty of murder in the second degree and assess his punishment at confinement in the State penitentiary for any period the jury may determine and state in their verdict, provided it be for not less than five years, but unless you do so believe, you will acquit the defendant.

"16. All persons are principals, who are guilty of acting together in the commission of an offense. When an offense has been actually committed by one or more persons, the true criterion for determining who are principals is, did the parties act together in the commission of the offense; was the act done in pursuance of a common intent and

in pursuance of a previously formed design in which the minds of all united and concurred? If so, then the law is that all are alike guilty, provided the offense was actually committed during the existence and in the execution of the common design and intent of all.

"17.   Before one can be held to be a principal, he must not only have been present when the offense was committed, but must have, in addition thereto, aided, encouraged, advised or agreed to the commission of the same, with a knowledge of the unlawful intent of the person actually committing it."

The first complaint of the fifteenth paragraph is to these words twice occurring therein, "in a passion aroused without adequate cause," because the evidence did not raise any such question.   These words should not have been in this charge.   We can only account for their being there by presuming that the judge used one of the printed forms of charges which are so commonly used by judges, wherein the question of manslaughter is raised and submitted, and, doubtless, as that question could not and did not arise in this case, the judge in the court below inadvertently failed to strike out those words.   It was expressly held by this court in the case of Combs v. State, 52 Texas Crim. Rep., 613: "We should not be inclined to reverse the case on the occurrence of these words in what is otherwise, in respects complained of, a most admirable charge, but we suggest to the court in view of another trial that this language should be omitted."

In the Combs case these words were used: "In a sudden transport of passion, aroused without adequate cause."   Many cases where the words "sudden transport of passion" were used have been reversed because of the use of such words when manslaughter arose and was submitted, but in this case the appellant, having received the lowest penalty for murder in the second degree, the use of the words complained of above could not be calculated to injure and did not injure the appellant.   Besides, if the said words, improperly used, had any effect at all, it was to place a greater burden on the State than ought to have been placed thereon and inured to the benefit of the appellant instead of against him.   Article 723, Code Criminal Procedure.

Complaint is also made of said paragraph fifteen because there was no evidence tending to show that Swink killed the child, or, if so, that appellant was present or acting in such a manner as would make him a principal to the alleged crime.

Complaint is also made that the court erred in submitting to the jury whether or not the child was killed by having been thrown in a slop jar or night glass or by having its head and bowels mashed and pressed, claiming that the evidence raised no such issue and there was no evidence that such injuries resulted in its death.

Complaint is also made to the sixteenth and seventeenth paragraphs charging on the law of principals, because the evidence did not raise such issue as to appellant and it is claimed the jury was probably

misled in believing that if Swink or Willie Wilbur killed the child at any time on the night of the alleged killing, that appellant would be guilty as a principal, and to infer that the court was of the opinion that such was a fact and that said paragraphs are mere abstract propositions and do not contain correct statements of the law of principals, nor do they tell the jury under what circumstances and conditions defendant would be guilty as a principal in the event the child was killed by someone else; and that said charge does not tell the jury that in order to be guilty as a principal, appellant must have been present and aiding the commission of the offense and, if not present and so aiding, the jury were left to infer that appellant would have been guilty as a principal although not present or doing anything in aid of Swink or whoever was committing the crime.

Prior to the enactment of article 723, Code Criminal Procedure, in construing that article, as it had theretofore been, in connection with article 715, this court had reversed cases where mere technical errors of commission or omission had been in the charge of the court. The Legislature, in amending article 723, as it was amended by the Act of March 12, 1897, expressly enacted that the judgment shall not be reversed, unless the error appearing from the record was calculated to prejudice the rights of the defendant; whereas, before then, said article, as it stood, seemed, and was construed, to require a reversal whether such error was calculated to injure or not. Even before this article was amended, the Supreme Court in Wright v. State, 41 Texas, 246, held that a judgment of conviction would not be reversed for improper instructions given in favor of the defendant, and cases prior to Green v. State, 32 Texas Crim. Rep., 298, which held that where erroneous charges were given, if excepted to, even though such injury inured to the benefit of the accused, required a reversal, were expressly overruled by this court. In Briscoe v. State, 37 Texas Crim. Rep., 464, on a trial for murder where the evidence established murder in the first degree, it was held that defendant could not be heard to complain that the court gave him a charge upon murder in the second degree. Also in Gonzales v. State, 35 Texas Crim. Rep., 33, this court held that a defendant who had been convicted of manslaughter could not claim any possible injury from a charge on mutual combat, even when such charge was not required by the evidence and that a charge upon imperfect self-defense, though not called for by the evidence, could do no possible harm to appellant where there was no self-defense in the case. It has also been held in many cases by this court that even though a specific portion of the charge of the court may be erroneous, when it is more favorable to the accused than he was entitled to upon the particular questions, he had no ground to complain. Wilkins v. State, 35 Texas Crim. Rep., 525; Scruggs v. State, 35 Texas Crim. Rep., 622; Delgado v. State, 34 Texas Crim. Rep., 157; English v. State, 34 Texas Crim. Rep., 190; Daud v. State, 34 Texas Crim. Rep.,

460; Loggins v. State, 32 Texas Crim. Rep., 364; Lujano v. State, 32 Texas Crim. Rep., 414; Boren v. State, 32 Texas Crim. Rep., 637; Green v. State, 32 Texas Crim. Rep., 298; Kelley v. State, 31 Texas Crim. Rep., 216; Sutton v. State, 31 Texas Crim. Rep., 297; Massey v. State, 31 Texas Crim. Rep., 371; Wolfforth v. State, 31 Texas Crim. Rep., 387; Gonzales v. State, 31 Texas Crim. Rep., 508; Weathersby v. State, 29 Texas Crim. App., 278; Surrell v. State, 29 Texas Crim. App., 321; Hawthorne v. State, 28 Texas Crim. App., 212; Walker v. State, 28 Texas Crim. App., 503; McCleveland v. State, 24 Texas Crim. App., 202; Carlisle v. State, 37 Texas Crim. Rep., 108.

We believe that these cases and many others later decided to the same effect and the proper construction of said article 723, as it now stands, does not authorize this court to reverse the judgment in this case even though there may be some technical omissions or commissions in the paragraphs of the charge of the court in this case, and especially is this the case when the appellant has requested no charge on the subject and thereby not given the lower court an opportunity to correct any such commission or omission before the verdict of the jury.

The only other complaint of the charge of the court and of the refusal of special charges requested which are of sufficient importance to require notice by us, is the complaint of appellant in his motion for new trial as to the charge given by the court and the refusal of his charge on the question of whether or not Willie Wilbur was an accomplice and whether or not these charges submit properly the question of the necessary corroboration of her if she was an accomplice.

After a most careful consideration of the evidence on this subject, we believe that in no proper consideration of the evidence does it tend to show that she was an accomplice in the killing of the child and while she was necessarily present at the birth and for several hours before the death of the child, whether it was killed or died from natural causes, she is nowhere shown by any direct testimony, or by any proper deductions from any of the testimony, to have done or said anything to indicate that she in any way participated in the killing of the child. There is some suggestion by appellant that she may have been guilty of abortion. If appellant had been charged with this offense, this court has repeatedly held that she would not have been an accomplice therein. Watson v. State, 9 Texas Crim. App., 237; Willingham v. State, 33 Texas Crim. Rep., 98; Hunter v. State, 38 Texas Crim. Rep., 61, and other cases.

The first special charge requested by appellant, omitting the heading and signature thereto, was: "I charge you that if you do believe that the child's neck was broken as alleged in the indictment, this would not be sufficient to corroborate the witness Wilbur." The court refused this, but doubtless because of the request therefor, in paragraph twenty-three, charged "the fact, if it is a fact, that the child's neck was

broken as alleged in the indictment, then this would not be sufficient to corroborate the witness Wilbur." In our opinion, this charge should not have been given, but that fact should have been left to the jury for its consideration on the subject, instead of prohibiting their doing so, but appellant, having asked and the court at his instance having given this charge, certainly has no ground to complain thereof.

The court, among other charges, gave these: "If you believe the infant child was prematurely born and that its death was caused thereby, or if you have a reasonable doubt thereof, you will acquit the defendant.

"If you believe that the child died from natural causes, or if you have a reasonable doubt thereof, you will acquit the defendant."

The other special requested charge by appellant and refused by the court, omitting the heading and signature thereto, was as follows: "I charge you that the evidence in this case shows that Willie Wilbur, the witness introduced by the State in said cause, is an accomplice, provided you believe that the child's neck was broken as alleged. I therefore charge you that unless you believe that said Willie Wilbur is corroborated in her testimony in said cause, though you should believe that said offense was committed and that the defendant committed it, yet you can not convict the defendant upon her testimony, unless you believe same has been corroborated by other testimony, other than that a crime was committed, if there was any committed."

The court, on the subject of accomplice and the corroboration of her testimony, gave these charges: "A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. An accomplice, as the word is here used, means anyone connected with the crime committed, either as principal offender, as an accomplice, as an accessory, or otherwise. It includes all persons who are connected with the crime by unlawful act or omission on their part, transpiring either before, at the time, or after the commission of the offense and whether or not she was present and participated in the commission of the crime.

"Now, if you are satisfied from the evidence that the offense charged was committed and you further believe that the witness, Willie Wilbur, was an accomplice, or you have a reasonable doubt as to whether she was or not as that term is defined in the foregoing instructions, then you are further instructed that you can not find the defendant guilty upon her testimony alone unless you first believe that her testimony is true, and connects the defendant with the offense charged and then you can not convict the defendant upon said testimony, unless you further believe that there is other testimony in the case corroborative of Willie Wilbur's testimony tending to connect the defendant with the

offense charged, and the corroboration is not sufficient, if it merely shows the commission of the offense charged.

"Corroboration as to matters immaterial and which do not tend to connect the defendant with the commission of the offense charged is not sufficient," and paragraph twenty-three of the court's charge above copied.

As stated above by us, we believe that Willie Wilbur was not an accomplice, but, as the appellant requested charges on that subject, even going to the extent of requesting the court to specifically state that she was an accomplice, the charge of the court on the subject was substantially correct and much more favorable to appellant than was requested by him, except that he did not charge in so many words, as requested, that she was an accomplice. It has been uniformly held by this court that unless the evidence, without doubt, shows that a witness is an accomplice, the court must submit that question to the jury to find and the court properly did so in this case. None of the criticisms of the court's charge on this subject are well taken, nor are they of sufficient importance to require a reversal of the judgment in this case.

We have given this case thorough study and investigation. We, like appellant's attorneys, can not fully understand from the record why the jury did not convict the appellant of murder in the first degree and even inflict the death penalty. The record convinces us that, beyond question, he unlawfully killed this child and that he was not convicted of a higher crime or given a severer punishment, results to his benefit and not to his injury. The record, in our opinion, shows no such error as would authorize or justify this court to reverse this case. Hence, it will, in all things, be affirmed.

*Affirmed.*

[Rehearing denied December 13, 1911.—Reporter.]